[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11202

_____

D.C. Docket No. 1:16-cr-20962-FAM-3


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ALEXANDER OBANDO,

Defendant - Appellant.


_____

No. 17-11276

_____

D.C. Docket No. 1:16-cr-20962-FAM-2


UNITED STATES OF AMERICA

Plaintiff - Appellee,

versus

LAUREANO ROBERTO QUIROZ-MENDOZA,

Defendant - Appellant.

_____

No. 17-11313
_____

D.C. Docket No. 1:16-cr-20962-FAM-1


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ALFONSO BITALIANO MARCILLO-MERA,

Defendant - Appellant.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 1, 2018)

Before WILLIAM PRYOR, JILL PRYOR, and BLACK, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

This appeal requires us to decide whether a flag painted on the side of a vessel is "flying" for the purpose of making a "claim of nationality or registry" under the Maritime Drug Law Enforcement Act, 46 U.S.C. § 70502(e). When the United States Coast Guard stopped the vessel *Siempre Malgarita* in international waters on suspicion of drug trafficking, Alexander Obando, Laureano Roberto

2

Quiroz-Mendoza, and Alfonso Bitaliano Marcillo-Mera were aboard the vessel, but they failed to produce documents evidencing nationality or to make a verbal claim of nationality or registry. Coast guardsmen spotted a Colombian flag painted on the hull of the *Siempra Malgarita*, but the master of the vessel asserted that the flag was Ecuadorian. The guardsmen did not ask Colombian officials whether the vessel was registered in Colombia or whether Colombia consented to the Coast Guard exercising jurisdiction. Guardsmen later boarded the vessel and arrested the crew members. In the district court, the crew members argued that the United States lacked jurisdiction because the painted Colombian flag constituted a claim of nationality under section 70502(e)(2) that obliged the Coast Guard to ask Colombian officials about the vessel. After the district court ruled that the vessel was stateless and subject to the jurisdiction of the United States, the crew members conditionally pleaded guilty. Because a painted flag does not fly, *id.* § 70502(e)(2), we affirm.

## I. BACKGROUND

On November 17, 2016, the United States Coast Guard Cutter *Edmonton* spotted the *Siempre Malgarita*, a 32-foot "go-fast" vessel, in international waters approximately 208 nautical miles off the coast of Guatemala. A Marine Patrol Aircraft observed the crew of the *Siempre Malgarita* "jettison[ing] packages into

3

the water," and the *Edmonton* launched a small vessel to investigate these packages, which tested positive for cocaine. The *Edmonton* also launched a second small vessel that intercepted the *Siempre Malgarita*.

The parties stipulated to facts about the interception that we use to assess jurisdiction. *See United States v. Iguaran*, 821 F.3d 1335, 1337 (11th Cir. 2016) ("Parties may . . . stipulate to facts that bear on our jurisdictional inquiry." (emphasis omitted) (citation and internal quotation marks omitted)). The guardsmen approached the *Siempre Malgarita* and identified her crew as Alexander Obando, Laureano Roberto Quiroz-Mendoza, and Alfonso Bitaliano Marcillo-Mera. The guardsmen also determined that Marcillo-Mera was the master of the vessel. All three crew members are citizens of Ecuador.

The guardsmen attempted to determine the nationality of the *Siempre Malgarita*, but none of the vessel's occupants made a verbal claim of nationality or registry for the vessel. Marcillo-Mera also failed to produce documents evidencing nationality or to identify the homeport of the vessel or its last port of call. Indeed, when asked, Marcillo-Mera told the guardsmen that "he did not know" the vessel's nationality. *See* 46 U.S.C. § 70502(d)(1)(B).

4

The guardsmen noticed a flag painted on the hull of the vessel, and they "believed it was a Colombian flag." But when they asked Marcillo-Mera about the flag, he asserted that it was the flag of Ecuador.

The two national flags are similar in appearance. The flag of Ecuador consists of horizontal bands of yellow, blue, and red and has a coat of arms in its center.

The Flag of Ecuador



The flag of Colombia does not have a coat of arms but is otherwise identical.

The Flag of Colombia



The Coast Guard sent a "Form 1: Action Request" to the government of Ecuador to determine whether the *Siempre Malgarita* was registered in Ecuador. On the form, the Coast Guard stated that the vessel lacked a "claimed nationality," but it acknowledged a "flag state claim via" "vessel markings." Ecuadorian officials could not confirm the nationality or registry of the vessel, and the Coast Guard never communicated with Colombian officials. The Coast Guard determined that the *Siempre Malgarita* was a vessel without nationality subject to the jurisdiction of the United States under the Maritime Drug Law Enforcement Act, *see* 46 U.S.C. § 70502(c)(1)(A), and the guardsmen arrested the crew members.

After the government charged the crew members with drug offenses, Marcillo-Mera moved to dismiss the charges on the basis that the United States lacked jurisdiction. He asserted that the Colombian flag painted on the *Siempre Malgarita* "was a claim of [Colombian] nationality in and of itself" and that "the Coast Guard contacted the incorrect flag state" when it instead communicated with Ecuadorian officials. A magistrate judge recommended that the district court deny the motion. The magistrate judge determined that the vessel was stateless based on the parties' stipulation "that when the Coast Guard inquired as to the nationality of the vessel," Marcillo-Mera "either said nothing or said he did not know." And the

6

magistrate judge reasoned that the painted Colombian flag was not itself "a claim of nationality or registry" because a painted flag cannot fly.

The district court adopted the report and recommendation. All three crew members then conditionally pleaded guilty to conspiracy to possess with intent to distribute a controlled substance in violation of the Act, *see id.* §§ 70503(a), 70506(b), but reserved the right to challenge the jurisdiction of the United States on appeal.

## II. STANDARD OF REVIEW

Whether the United States has extraterritorial jurisdiction under the Act is a question of law that we review *de novo. See Iguaran*, 821 F.3d at 1336.

## III. DISCUSSION

We divide our discussion in two parts. First, we explain that the United States has jurisdiction over the *Siempre Malgarita* and its crew because the painted Colombian flag on its hull was not "flying" for the purpose of making a "claim of nationality or registry." 46 U.S.C. § 70502(e). Second, we reject the crew members' alternative arguments about why the United States lacks jurisdiction.

### A.    A Flag Painted on a Vessel Does Not Fly.

The Maritime Drug Law Enforcement Act grants the United States extraterritorial jurisdiction over "vessel[s] without nationality." *Id.*

7

§ 70502(c)(1)(A). The Act states that a vessel is without nationality if "the master or individual in charge fails, on request of an officer of the United States . . ., to make a claim of nationality or registry for that vessel." *Id.* § 70502(d)(1)(B). And the Act provides three exclusive methods for the master or individual in charge to make a "claim":

> (1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;
> (2) flying its nation's ensign or flag; or
> (3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.

*Id.* § 70502(e). If the master of a vessel in international waters makes a claim of foreign nationality that is affirmed by the asserted nation, *see id.* § 70502(d)(1)(A) & (C), the United States ordinarily must obtain "consent[]" from that nation before exercising jurisdiction, *id.* § 70502(c)(1)(C).

Whether the United States has extraterritorial jurisdiction over a vessel is a "preliminary question[] of law" decided by the district court and "not an element of [the] offense." *Id.* § 70504(a); *see also United States v. Campbell*, 743 F.3d 802, 805 (11th Cir. 2014). The answer to this question determines whether the district court may exercise subject matter jurisdiction, "for a district court . . . ha[s] adjudicatory authority over a charge that a defendant conspired to violate the substantive crime defined in the [Act]" only if "the conspira[tors'] vessel was,

8

when apprehended, subject to the jurisdiction of the United States." *Iguaran*, 821 F.3d at 1336 (alteration adopted) (quoting *United States v. De La Garza*, 516 F.3d 1266, 1272 (11th Cir. 2008)). "[T]he government bears the burden of establishing . . . jurisdiction . . . ." *United States v. Tinoco*, 304 F.3d 1088, 1114 (11th Cir. 2002); *see also Iguaran*, 821 F.3d at 1338.

The crew members stipulated that the master of the *Siempre Malgarita* failed to produce documents evidencing the vessel's nationality or to make a verbal "claim of nationality or registry," *see* 46 U.S.C. § 70502(e)(1) & (3), but they contend that the painted flag on the side of the vessel constituted a claim of Colombian nationality that obliged the Coast Guard to ask Colombian officials whether the vessel was registered there and whether Colombia consented to the exercise of jurisdiction by the United States. This argument fails if the Colombian flag painted on the hull was not "flying." *Id.* § 70502(e)(2). It was not.

The ordinary meaning of the word "flying" requires a flag to be capable of freely moving in the air. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012) ("Words are to be understood in their ordinary, everyday meanings . . . ."). For example, Webster's New International Dictionary defines "fly" as "[t]o cause to fly or to float in the air as a . . . flag," and it offers the illustrative phrase of "the ship flew the flag of Spain." *Fly, Webster's*

9

*New International Dictionary* 976 (2d ed. 1961) (emphasis omitted). Webster's Third New International Dictionary gives a nearly identical definition. *Fly, Webster's Third New International Dictionary* 879 (3d ed. 1993) ("[T]o cause to fly or float in the air (as a bird, a flag) . . . ."). And the Oxford English Dictionary defines "fly" as, "[t]o set (a flag) flying; to *carry at the mast-head; to hoist.*" *Fly, Oxford English Dictionary* (online ed.) (emphasis added). All of these definitions entail the movement of a physical object in the air. Indeed, the Oxford English Dictionary applies the same definition of "fly" to the act of "set[ting] (a sail) loosely." *Id.*

To be sure, the ordinary meaning of a term will yield when the term has "a technical meaning" or is a "term[] of art," *see* Scalia & Garner, *supra*, at 73 (emphasis omitted), but the meaning that the phrase "flying a flag" carries in the maritime context confirms that a vessel's flag must be able to move freely in the air. For example, the Oxford English Dictionary, in a section on "nautical phrases," defines "to keep the flag flying" as "to refuse to haul down one's flag and surrender." *Flag*, *Oxford English Dictionary*, *supra*. A painted flag cannot be "haul[ed] down." *Id.*

A maritime treatise confirms that a vessel's flag must be hoisted in the air. *See* H. Meyers, *The Nationality of Ships* (1967). It refers to the physical "hoisting

10

[of a] flag" to assert nationality, *id.* at 162, explains that "when [sea] traffic is heavy . . . [a] flag will have to be *flown from the stern*," *id.* at 163 (emphasis added), and cautions that a vessel's flag may not always be a reliable "indicator" of nationality because it can be "easily changed," *id.* at 140. It also explains that there may be times "when flying the flag cannot reasonably be required," such as in the presence of "heavy gales" or if a "flag[] [is] blown overboard." *Id.* at 164–65. Neither of these perils is relevant to painted flags. And the treatise presumes that vessels that are physically incapable of hoisting flags are similarly unable to "fly" flags when it discusses a hypothetical "deep sea research" submarine that, when "under water at all events . . ., will not fly a flag." *Id.* at 166.

Maritime etiquette supports the same definition. For example, a procedural guide published by the United States Navy offers extensive instructions for "hoisting and lowering" the flag. Department of the Navy, NTP 13(B), Flags, Pennants & Customs 3-1 (1986). It also explains that a vessel's crew must "haul[] [the ensign] down" after sunset, *id.* at 3-1, and that a vessel may "dip" its flag to salute another vessel, *id.* at 3-1 to 3-2. But the guide never suggests that a flag may be painted on a vessel. On the contrary, its discussion of painted symbols is limited to non-flag "emblems," such as the medical cross. *Id.* at 17-11. It also specifically forbids service members from "paint[ing]" "[s]tars or *replicas* of personal flags . . .

11

on vehicles," *id.* at 14-1 (emphasis added), which suggests that *real* flags consist of more than paint. A Navy protocol handbook explains that "[t]he national ensign shall be displayed during daylight from the gaff (or from the triatic stay . . .)" and speaks in dynamic terms of "the hoisting, lowering[,] or flying of the ensign." Department of the Navy, 1710.7A, Social Usage and Protocol Handbook J-19 (2001); *see also id.* at J-20 (discussing "[d]ipping the national ensign" and "[h]alf-masting the national ensign"). The guide also fails to mention painted flags, and it distinguishes flags from the more general category of "distinctive mark[s]." *Id.* at J-19. And a flag guide published by a civilian group provides that even motorboats without a mast or rigging should still have a means of hoisting a flag. *See* United States Power Squadrons, *Flag Etiquette*, http://www.usps.org/f_stuff/etiquett.html (last visited May 31, 2018) (discussing the "United States Ensign").

Other federal statutes about the display of flags clearly imply that a flag flies only when hoisted in the air, and "laws dealing with the same subject . . . should if possible be interpreted harmoniously." Scalia & Garner, *supra*, at 252. For example, one statute provides that "[w]hen flags of two or more nations are displayed, they are to be *flown from separate staffs* of the same height," 4 U.S.C. § 7(g) (emphasis added), that when "flags are *flown from adjacent staffs*, the flag of the United States should be *hoisted first and lowered last*," *id.* § 7(f) (emphases

12

added), and that "[t]he flag, when *flown at half-staff*, should be first *hoisted to the peak*," *id.* § 7(m) (emphases added). And the statute does not use the term "flying" to refer to the display of flags that are not hoisted in the air. It instead uses different verbs like "drap[ing]," *id.* § 7(b), "display[ing]," *id.* § 7(i) & (k), and "cover[ing]," *id.* § 7(n), to describe that kind of use. And a related statute explains that the "flag patch" worn by military and emergency personnel should be "*affixed* to the[ir] uniform[s]." *Id.* § 8(j) (emphasis added). "Flying" refers to a particular method of displaying a flag, and the Maritime Drug Law Enforcement Act uses this specific word instead of the more general term "displaying."

The crew members contend that the phrase "flying a flag" refers to any kind of visual depiction of a flag that suggests the nationality of the vessel, and they highlight that the "Form 1" template used by the Coast Guard to communicate with foreign governments in this kind of maritime interception suggests the possibility of a "flag state claim via" a "flag *painted* on [the] stern" of the vessel. But whether the Coast Guard considers a painted flag to be an assertion of national affiliation is not the same question as whether that flag is "flying" under the Act.

That the Coast Guard may embrace a functionalist interpretation of how the master of a vessel may assert nationality in the interest of diplomatic caution cannot change the ordinary meaning of the statutory text. Indeed, the form permits

13

a "flag state claim" by means not included in the exclusive list provided in the Act, such as by a "homeport [marked] on [the] stern" or a "verbal" claim by a "*non-master.*" *See* 46 U.S.C. § 70502(e) (explaining that "[a] claim of nationality or registry . . . includes *only* . . . (1) possession . . . and production of documents . . .; (2) flying [a] . . . flag; or (3) a verbal claim . . . by the master or individual in charge" (emphasis added)). The form also offers no suggestion that the Coast Guard has adopted a definitive or consistent interpretation of the phrase "flying a flag" worthy of any kind of administrative deference. *Cf. Reno v. Koray*, 515 U.S. 50, 61 (1995) (explaining that an "internal agency guideline . . . is still entitled to some deference" when "it is a permissible construction of the statute" (citations and internal quotation marks omitted)). Indeed, the Coast Guard did not even check the "painted" flag box on the "Form 1" that it submitted to Ecuadorian officials after stopping the *Siempre Malgarita*, despite the stipulation that the guardsmen saw the painted flag. And the crew members offer no additional evidence that the Coast Guard credits painted flags as claims of nationality.

The crew members cite idioms that suggest that the phrase "[f]lying the flag" refers to a general invocation of a vessel's "association with a nation," but we are unpersuaded. They cite the Cambridge Idioms Dictionary, which defines "fly/show/wave the flag" as "to support or to represent [one's] country," *Flag*,

14

*Cambridge Idioms Dictionary* 145 (2006), and the Farlex Dictionary of Idioms,

which defines the phrase "fly the flag" as to "represent or demonstrate support for

[one's] country," *Fly the Flag*, *Farlex Dictionary of Idioms*,

https://idioms.thefreedictionary.com/Flying+the+Flag (last visited May 31, 2018).

And they cite the Oxford Living Dictionaries, which defines "fly the flag" "of a

ship" as to "be registered in a particular country and sail under its flag." *Fly the*

*Flag*, *Oxford Living Dictionaries*, https://en.oxforddictionaries.com/definition/

fly_the_flag (last visited May 31, 2018). But were we to interpret the phrase

"flying the flag" broadly to include a wide array of methods of signaling that a

vessel is "registered in a particular country and sail[ing] under its flag," *id.*, we

would render superfluous the other two specific methods of claiming nationality

provided in the Act: the "possession . . . and production of documents evidencing

the vessel's nationality," 46 U.S.C. § 70502(e)(1), and "a verbal claim of

nationality . . . by the master," *id.* § 70502(e)(3). And the presumption against

surplusage directs us to give effect to "every word and every provision" of a statute

and not "giv[e] an interpretation [to one provision] that causes it to duplicate" other

provisions. Scalia & Garner, *supra*, at 174. To be sure, the crew members modestly

limit their definition of "flying a flag" to a visual "display [of] a flag" sufficient "to

put [the] United States . . . on notice of another country's interests." But their

15

preferred idiomatic definitions encompass a wider range of expressive conduct that would swallow the three specific and exclusive methods outlined in the Act. *See* 46 U.S.C. § 70502(e)(1)–(3). In any event, extensive authorities on maritime practices trump the broader definitions cited by the crew members and confirm that "flying [a] . . . flag" is a distinct act that requires a flag to be hoisted in the air. *Id.* § 70502(e)(2).

The crew members also contend that statements in our precedents that addressed other questions about the Act suggest that the definition of "flag" includes any kind of visual symbol, but we disagree. For example, in *Campbell* we mentioned that a "vessel lacked all indicia of nationality: it displayed no flag, port, or registration number." 743 F.3d at 804. And in *United States v. de la Cruz* we explained that the stateless "vessel in question flew no flag, carried no registration paperwork, and bore no markings indicating its nationality." 443 F.3d 830, 832 (11th Cir. 2006). According to the crew members, this language suggests that any visual depiction of a flag is enough. But even if these statements addressed the question whether a painted flag can "fly," they would cut the other way. Our separate mentions of whether a vessel "flew [a] flag" or "bore . . . markings indicating its nationality," *id.*, imply that a flying flag is *distinct* from other visual displays that also suggest nationality.

16

To be sure, the only other decision to address this question assumed, for the sake of argument, the opposite conclusion. In *United States v. Prado*, 143 F. Supp. 3d 94 (S.D.N.Y. 2015), the Southern District of New York ruled that a "small emblem of what appear[ed] to be an Ecuadorian flag . . . affixed to [a] boat[]," *id.* at 97, was not "flying . . . within the meaning of the [Act]," *id.* at 101 (citation and internal quotation marks omitted). The district court declined to adopt the argument of the government "that a piece of fabric must wave in the air." *Id.* at 100. Instead, it explained that the phrase "'flying a nation's ensign or flag' . . . at a minimum refer[s] to a display sufficiently prominent as to put a United States official on notice of another country's interests" before it concluded that the particular emblem in question was "not remotely large or prominent enough." *Id.* (alteration adopted) (citation omitted).

Not only was this functionalist analysis unnecessary in the light of the ordinary meaning of the phrase "flying a flag," but the opinion in *Prado* also highlighted the inherent difficulty of dispensing with the requirement of a hoisted flag when it grappled with the question whether the "emblem" on the vessel in question was "enough to put a reasonable official on notice that [another country's] interests might be affected." *Id.* The district court began its analysis by "assuming" that the emblem was "an image of an Ecuadorian flag," *id.*, and it acknowledged

17

that the emblem, "[u]nlike a prominently displayed flag, . . . [is] easily confused with ornamentation . . . [and] difficult to see in any waters, not to mention . . . in the large waves of the high seas," *id.* at 100–01; *see also id.* at 97 ("[A] small emblem of *what appear*[*ed*] *to be* an Ecuadorian flag had been affixed to the boat's rear starboard side." (emphasis added)). It also underscored that "[t]he emblem [was] very much smaller than . . . nearby . . . images running the length of the boat's side," *id.* at 101, in concluding that this particular emblem was not "enough," *id.* at 100. In contrast, a flag hoisted in the air avoids these line-drawing problems and provides certainty to both American officials on the high seas and the courts that second-guess their decisions.

The ambiguities posed by painted flags also rebut the crew members' practical complaint that the requirement of a physical flag will "lead to absurd results" because "a postage-stamp size . . . flag  hoisted on a ship's mast could constitute a claim of nationality but a flag several feet long by several feet wide painted on the . . . hull of a boat could not." Indeed, the Act has good reason to require an actual flag of any size instead of a painted representation. Consider a vessel painted with horizontal red, white, and blue stripes. Is this vessel flying the flag of the Netherlands? Or is it instead owned by a captain who only likes those colors? And as illustrated by *Prado*, static "emblems" require fact-intensive

18

inquiries into the size, location, and intended meaning of such markings. *See id.* at 100–01. A flag hoisted in the air avoids these questions and unambiguously asserts nationality.

The crew members also assert that our interpretation may create conflicts within international law because vessels registered in countries that permit painted flags will be "deemed stateless by American [vessels] and boarded," but this fear about miscommunications on the high seas overlooks that the Act provides alternative methods of claiming nationality, including a simple "*verbal claim* of nationality or registry." 46 U.S.C. § 70502(e)(3) (emphasis added). Indeed, "the flying of the national flag [has] never [been] the cause of—or the condition for—allocation [of nationality]." Meyers, *supra*, at 162; *see also id.* at 140. The requirement that a vessel hoist a flag in the air will not render helpless foreign vessels that have only painted flags.

Finally, the crew members argue that we should invoke the rule of lenity because the statute is ambiguous, but the rule of lenity applies only when "traditional canons of statutory construction . . . [leave us] with an ambiguous statute." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011) (quoting *United States v. Shabani*, 513 U.S. 10, 17 (1994)). We have

19

already explained that the ordinary meaning of the term "flying" requires a flag to be hoisted in the air.

### B.    *The Crew Members' Alternative Arguments Are Unpersuasive.*

The crew members also assert several alternative and fact-bound reasons why we should hold that the United States lacks jurisdiction. None are persuasive. We reject each in turn.

The crew members contend that we should overlook the stipulation that no crew member made a claim of nationality and instead determine that Marcillo-Mera's "statement that the vessel's flag was 'Ecuadorian' . . . [was] tantamount to a claim of nationality" that obligated "the Coast Guard to contact the government of Colombia," but this reasoning is wholly unpersuasive. Parties may "stipulate to facts that bear on our jurisdictional inquiry." *Iguaran*, 821 F.3d at 1337 (emphasis omitted) (citation and internal quotation marks omitted). And because the parties stipulated that no crewmember made a claim of nationality, we refuse to ignore this stipulation on appeal and act as a factfinder in the first instance.

The crew members also contend that the government is estopped from asserting "that there was never any claim of nationality" because the "Coast Guard's [decision to] contact[] . . . Ecuador" suggests that guardsmen thought that the defendants had asserted nationality, but this logic suffers from two flaws. First,

20

that the Coast Guard elected to communicate with Ecuadorian officials does not necessarily imply that the guardsmen thought that the defendants had satisfied their burden of asserting nationality under the Act. Indeed, the guardsmen may have acted out of an abundance of caution, and we see no reason to punish the government for doing more than the Act requires. Second, the crew members voluntarily stipulated to the fact that they made no verbal claim of nationality, and there is no suggestion that the government dishonestly induced this stipulation or changed its position mid-litigation.

Finally, the crew members contend that the guardsmen acted in bad faith because they "purposely chose not to contact the Colombian government" despite knowing that the flag painted on the vessel was Colombian. But this appeal to the subjective knowledge of the guardsmen again overlooks the stipulations that the crew members failed to make a verbal claim of nationality and that the only verbal suggestion of nationality was Marcillo-Mera's statement that the flag was Ecuadorian. As the master of the vessel, he owed the obligation to claim nationality. *See* 46 U.S.C. § 70502(d)(1)(A)–(C). And because the guardsmen knew that Marcillo-Mera was Ecuadorian, they had good reason to conclude that Ecuador was the correct target for their inquiry.

21

## IV. CONCLUSION

We **AFFIRM** the judgments of conviction against Obando, Quiroz-Mendoza, and Marcillo-Mera.

BLACK, Circuit Judge, specially concurring:

I concur in the Court's opinion, but I write separately because there is an additional ground for affirmance. Section 70502(d) of the Act places the burden of claiming a vessel's nationality on "the master or individual in charge." *See* 46 U.S.C. § 70502(d)(1); *United States v. Rosero*, 42 F.3d 166, 171 (3d Cir. 1994). As the Court's opinion notes, the parties stipulated that the *Siempre Malgarita*'s master made no such claim. USDC Doc. 31 at ¶ 4 ("Neither the defendant Marcillo-Mera, as the master of the vessel, nor the co-defendants, Quiroz-Mendoza and Obando, as the crew members, made a claim of nationality or registry for the vessel."); *id.* at ¶ 5 ("When the boarding team asked about the vessel's nationality, the defendant Marcillo-Mera stated that he did not know . . . ."); *id.* at ¶ 6 ("The USCG Edmonton communicated the master's failure to make a claim of nationality or registry of vessel . . . ."). Thus, because "the master or individual in charge" did not make a claim of nationality or registry for the ship, the *Siempre Malgarita* was a "vessel without nationality" under the plain language of § 70502(d)(1). *See* 46 U.S.C. § 70502(d)(1).

The Act's focus on the words and actions of a vessel's master is consistent with longstanding principles of admiralty law. As Chief Justice John Marshall stated in 1818, "[t]he mere wood, iron, and sails of the ship, cannot, of themselves,

23

violate the law. But this body is animated and put in action by the crew who are guided by the master. *The vessel acts and speaks by the master. She reports herself by the master.*" *United States v. The Little Charles*, 26 F. Cas. 979, 982 (Marshall, Circuit Justice, D. Va. 1818) (No. 15,612) (emphasis added); *see also Dobbins's Distillery v. United States*, 96 U.S. 395, 402 (1877) (same); *United States v. Cargo of the Brig Malek Adhel*, 43 U.S. (2 How.) 210, 234 (1844) (same). Requiring the master to speak on behalf of the ship also makes sense for practical reasons. *See Rosero*, 42 F.3d at 171 (noting that by placing the burden of claiming nationality on the vessel's master, Congress alleviated the practical difficulties associated with requiring the Coast Guard to disprove all possible claims of nationality).

It was incumbent upon the *Siempre Malgarita*'s master to assert a claim of nationality on behalf of the ship. He did not, and Appellants' contention that the *Siempre Malgarita* spoke for itself[1] is contrary to both the statute's plain language

---

[1] *See* Br. of Appellant Marcillo-Mera at 11 ("The Colombian flag painted on the side of the *Siempre Malgarita* put the Coast Guard on notice that *the vessel* claimed Colombian nationality . . . . [T]*he Siempre Malgarita* never claimed to be Ecuadorian . . . ." (second emphasis added)); USDC Doc. 20 at 7 ("[E]ffectively, the *Siempre Malgarita*, *speaking for herself*, told the boarding team she was Colombian." (emphasis added)).

and established principles of admiralty law.  Given the stipulated facts,[2] I would

affirm the district court on the additional basis that there was no claim of

Colombian nationality or registry attributable to the vessel's master under

§ 70502(d)(1), regardless of whether the painted Colombian flag could otherwise

support a claim of nationality or registry under § 70502(e).

---

[2] Appellants attempt to contradict the stipulated facts on appeal and argue that, to the extent an act attributable to the vessel's master is necessary, the master asserted a claim of Colombian nationality by setting out to sea in a vessel bearing the Colombian flag.  The master, however, stated he believed the flag was Ecuadorian.  Thus, even if we allowed Appellants to contradict the stipulated facts on appeal, the vessel's master could not have intentionally asserted a claim of Colombian nationality based on a flag he believed to be Ecuadorian, and it would be unreasonable to suggest he could have made such a claim accidentally.

25