[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14181

_____

D.C. Docket Nos. 1:19-cr-00033-JB-N-2,
1:19-cr-00033-JB-N-3,
1:19-cr-00033-JB-N-1,
1:19-cr-00033-JB-N-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PEDRO DINO CEDADO NUNEZ,
MANELY ENRIQUEZ,
ANGEL CASTRO GARCIA,
MIKE CASTRO MARTINEZ,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Alabama

_____

(June 17, 2021)

Before WILLIAM PRYOR, Chief Judge, GRANT and TJOFLAT, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

These appeals present several issues about the convictions of four drug smugglers under the Maritime Drug Law Enforcement Act. Three threshold issues involve jurisdiction: whether a vessel lacks nationality when, upon request by the Coast Guard, no member of the crew identifies himself as the master or individual in charge and the vessel otherwise lacks any indicia of nationality or registry; whether a district court must hold an evidentiary hearing to determine jurisdiction under the Act; and whether the district court erred by delaying a jurisdictional ruling. The remaining two issues are whether sufficient evidence supports the smugglers' convictions and whether the district court deprived them of a fair trial by limiting their cross-examinations of witnesses. We conclude that the United States had jurisdiction over the smugglers' stateless vessel, no evidentiary hearing was required for that ruling, and any error in delaying it was harmless. We also conclude that sufficient evidence supported the smugglers' convictions because their indictments did not obligate the government to prove that they knew the identity of the controlled substance they carried. And because the district court afforded them a meaningful opportunity to present a complete defense, we affirm their convictions.

## I. BACKGROUND

On Christmas Eve 2018, the United States Coast Guard intercepted a small, homemade boat on the verge of sinking in choppy waters of the high seas between

the Dominican Republic and Puerto Rico. The crew of a Coast Guard airplane first spotted the boat while patrolling the narcotics-trafficking route northeast of the Dominican Republic and northwest of Puerto Rico. The guardsmen considered the boat suspicious because it carried a large number of fuel containers, lacked a visible name or registration number, and used no navigation lights. They reported it to a nearby Coast Guard cutter, the *Richard Dixon*, which detached a small "over-the-horizon" boat to intercept the suspicious boat.

The Coast Guard's boat caught up to the suspicious boat about 50 nautical miles from the coast of the Dominican Republic. It approached with its lights off and shined a spotlight when it was 20 or 30 feet away from the suspicious boat. Coast guardsmen saw "frantic" activity aboard the suspicious boat as two men threw things overboard. When the guardsmen stopped the boat, they found six bales in the water tied to each other and to a seventh bale still inside the boat. The suspicious boat was small—just 20 or 25 feet long—and between the four men, seven bales, and a dozen 30-gallon fuel containers, little space remained aboard. The guardsmen took a photo of the boat, which is reproduced below.

3



A Coast Guard officer asked the men "who was the master, who was in charge." No one answered, so he asked who piloted the boat. One of the men answered that they all took turns. The others appeared to agree, based on their body language. The boat had a hand tiller that each person could operate for only about three hours at a time. The men said they were traveling from Santo Domingo in the Dominican Republic to Dorado, Puerto Rico. They estimated they had been traveling for five or six days, although they later said they had been on the water for between five and seven hours. As winds gusted, the waters grew choppy, so the Coast Guard moved the men into the over-the-horizon boat.

Then the guardsmen searched the smugglers' boat. They found that the serial number had been filed off its outboard motor. And the boat contained no fishing or recreational equipment and only a few personal items.

4

With the search complete, the bales gathered, and the four smugglers safe, the Coast Guard destroyed the boat by throwing a flare next to the fuel containers. The over-the-horizon boat returned the smugglers to the *Richard Dixon*. On board, the four men identified themselves as Pedro Dino Cedado Nunez, Manely Enriquez, Angel Castro Garcia, and Mike Castro Martinez.

The *Richard Dixon* brought the smugglers to Saint Thomas in the Virgin Islands about 10 days later. There, a Homeland Security agent met the smugglers and flew with them to Mobile, Alabama. He interviewed all four men individually that day.

Garcia confessed that two people he did not know offered him $5,000 to travel to Puerto Rico, and he agreed to go. When the agent referred to the boat as carrying "one hundred kilos of cocaine," Garcia denied knowledge of the quantity but did not deny knowing the boat was carrying cocaine. The agent responded, "But, that is what it was. . . . You were taking cocaine and you were going from the Dominican Republic to Puerto Rico." "That's where we were going," Garcia confirmed. Garcia also reported that he told the other three men not to throw the bales overboard because they were "already caught."

Martinez and Enriquez provided similar confessions. Martinez said a friend offered him $5,000 to "take some things" to Puerto Rico. He knew when he got onto the boat that the bales contained drugs. He said he was not in charge of the

boat, and he laughed when the agent asked if there was a captain. And he said all four men decided together to turn around and return to the Dominican Republic when the engine started sputtering. For his part, Enriquez said a man he knew offered him $5,000 to take the boat to Puerto Rico. He knew that he was transporting drugs.

The bales weighed about 180 kilograms, and the four men stipulated that they contained cocaine. The cocaine had a street value of $25 or $30 million.

The United States charged the men under the Maritime Drug Law Enforcement Act with possessing cocaine with intent to distribute and conspiring to distribute and to possess cocaine with intent to distribute. 46 U.S.C. §§ 70503(a)(1), 70506(b). The indictment alleged that they "did willfully, knowingly and unlawfully conspire with each other . . . to distribute and possess with the intent to distribute approximately 182 kilograms of cocaine." The defendants pleaded not guilty.

Before trial, the government moved for a ruling that the United States had jurisdiction over the smugglers' boat as a stateless vessel under the Maritime Drug Law Enforcement Act. It attached the statements of three guardsmen about their encounter with the boat and its crew. The guardsmen reported that they searched the boat for "indications of nationality" or "markings, paperwork[,] or

6

identification numbers" but found none. The smugglers moved to dismiss the indictment for lack of jurisdiction and requested an evidentiary hearing.

At a pretrial hearing, the district court made a provisional finding of jurisdiction because the Coast Guard intercepted the vessel in international waters, it contained "no flag[,] no vessel registration documents[, and] no other indicia of nationality," and "[n]o crew member claimed nationality or registry of the vessel." It rejected the argument that an evidentiary hearing was required under the Act, especially when the smugglers did not contest the jurisdictional facts and had not identified any evidence they hoped to introduce. The district court told the smugglers they could question the government's witnesses about the jurisdictional evidence outside the jury's presence during the trial.

Before trial, the government also moved *in limine* to bar the smugglers from introducing evidence about the conditions of their confinement on the *Richard Dixon*. All four smugglers objected. After discussing the matter during a pretrial hearing, the judge granted the motion. But he said that he might revisit the ruling during the trial if the evidence appeared to be relevant.

The trial lasted two days. As soon as the jury was sworn, all four smugglers moved for a mistrial on jurisdictional grounds. The judge offered them an opportunity to contest the jurisdictional facts by immediately questioning the government's witnesses. Nunez declined because he "was not afforded an

opportunity to subpoena the witnesses [he] wanted," but he did not identify any additional witnesses he would have called if he had the chance. The judge reiterated that the smugglers would be allowed to cross-examine the government's witnesses about jurisdictional issues as they testified.

Garcia's counsel cross-examined a Coast Guard petty officer about where the men were detained on the *Richard Dixon*. The petty officer answered that they were placed on "the top deck of the cutter towards the back where we place all our detainees and migrants." He stated that he did not know if they were shackled. The government objected after a few questions, and the district court sustained the objection. After further argument, the district court clarified that the defense could present evidence about the smugglers' transportation from Saint Thomas to Mobile immediately before they gave their incriminating statements, but they could not present more evidence about their detention on the *Richard Dixon*.

Later, Garcia's counsel sought to ask the Homeland Security agent who interviewed the men whether he knew that they had been kept shackled and on the deck of a ship for the preceding "14 . . . or 15 days." The district court refused to allow the line of questioning, but it allowed the attorney to ask the agent if he was "aware of any circumstance that might have caused [the smugglers] duress or stress before [he] met them[.]"All four defendants objected to the ruling.

None of the defendants sought to introduce or elicit on cross-examination any evidence about jurisdiction. At the end of the trial, all four smugglers moved for acquittal on the ground that the government had failed to prove jurisdiction. The district court responded that "to the extent I need to make a separate ruling, . . . I find that we have subject matter jurisdiction in this court over this case."

All four smugglers also moved for a judgment of acquittal based on insufficient evidence at the close of the government's case and again after they rested. The district judge denied the motions. The jury convicted each smuggler on both charges. Martinez, Garcia, and Enriquez received concurrent sentences of 188 months in prison on each count. Nunez received concurrent sentences of 152 months of imprisonment on each count.

## II. STANDARDS OF REVIEW

A few different standards govern our review. We review the interpretation of the Maritime Drug Law Enforcement Act *de novo* and underlying jurisdictional findings of fact for clear error. *United States v. Tinoco*, 304 F.3d 1088, 1114 (11th Cir. 2002). We review a decision about whether to grant an evidentiary hearing for abuse of discretion. *United States v. Barsoum*, 763 F.3d 1321, 1328 (11th Cir. 2014). We review the sufficiency of the evidence *de novo* and view the evidence in the light most favorable to the government. *United States v. Estrada*, 969 F.3d 1245, 1265 (11th Cir. 2020). We also review *de novo* whether the exclusion of

9

evidence violated a constitutional guarantee. *United States v. Ruan*, 966 F.3d 1101, 1154 (11th Cir. 2020). If it did, we will reverse unless the error was "harmless beyond a reasonable doubt." *United States v. Hurn*, 368 F.3d 1359, 1362–63 (11th Cir. 2004) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

### III. DISCUSSION

We divide our discussion in four parts. We first explain why the United States had jurisdiction over the smugglers' vessel. Next, we reject the smugglers' argument that the district court was obliged to grant them an evidentiary hearing on jurisdiction and conclude that any error in delaying a jurisdictional ruling was harmless. We then explain that sufficient evidence supports the challenged convictions. We finally decide that the ruling limiting evidence about the smugglers' confinement at sea did not infringe their right to present a complete defense, and alternatively any error was harmless.

### A. Jurisdiction Existed Under the Maritime Drug Law Enforcement Act.

The Maritime Drug Law Enforcement Act prohibits knowing possession of controlled substances with intent to distribute aboard "covered vessel[s]." 46 U.S.C. § 70503(a)(1). A "covered vessel" is the first link in a chain of facts that determines subject-matter jurisdiction. *United States v. De La Garza*, 516 F.3d 1266, 1271–72 (11th Cir. 2008). The required proof of those facts reflects concern for "smooth relations between sovereigns in the domain of international waters."

10

*Tinoco*, 304 F.3d at 1109. In keeping with those concerns, covered vessels are vessels of the United States; any vessel, if the individual in question is a United States citizen or resident alien; and "vessel[s] subject to the jurisdiction of the United States." 46 U.S.C. § 70503(e). This appeal involves only the third category.

A vessel is "subject to the jurisdiction of the United States" if it is in the customs waters of the United States or the territorial waters of a foreign nation that consents to the enforcement of United States law, if it is "a vessel without nationality," or in a few other circumstances. *Id.* § 70502(c)(1). And the Act describes three ways to establish that a vessel lacks nationality when the government encounters the master or individual in charge of the vessel:

> [T]he term "vessel without nationality" includes—
> (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
> (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
> (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

*Id.* § 70502(d)(1).

Section 70502(d)(1) does not list every circumstance in which a vessel lacks nationality. It uses the word "includes," which ordinarily introduces only examples. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of*

11

*Legal Texts* § 15, at 132–33 (2012). And its use of the term "includes" differs materially from the use of the phrase "includes only" in the next subsection. 46 U.S.C. § 70502(e). That material variation confirms that the three circumstances enumerated in section 70502(d)(1) provide only examples of when a vessel lacks nationality, not an exhaustive list. Scalia & Garner, *Reading Law* § 25, at 170–73. To determine what other vessels are "vessel[s] without nationality," we interpret that term against the backdrop of its "reasonably well developed meaning" in customary international law. *United States v. Rosero*, 42 F.3d 166, 170–71 (3d Cir. 1994) (Alito, J.); *see also United States v. Matos-Luchi*, 627 F.3d 1, 4 (1st Cir. 2010).

Under customary international law, any nation may grant ships the right to sail under its flag. Convention on the High Seas art. 4, *opened for signature* Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82. A vessel registered to a nation is ordinarily subject to that nation's exclusive jurisdiction. Craig H. Allen, *The Peacetime Right of Approach and Visit and Effective Security Council Sanctions Enforcement at Sea*, 95 Int'l L. Stud. 400, 413 (2019). Association with a single nation protects the vessel from most interference by other nations. *Id.* at 413 & n.67.

A ship seeking the protection of nationality will usually make its association with its flag state obvious—classically, by flying a flag and carrying official

12

documents as evidence of its association with its flag state. *See* Convention on the High Seas art. 5(2) ("Each State shall issue to ships to which it has granted the right to fly its flag documents to that effect."); *United States v. Obando*, 891 F.3d 929, 934–38 (11th Cir. 2018). If a country decides to attribute its nationality to a vessel, that decision must be "disclos[ed]" so that the attribution of nationality is "cognoscible" or "ascertainab[le]." H. Meyers, *The Nationality of Ships* 156 (1967); *see also* Myres S. McDougal et al., *The Maintenance of Public Order at Sea and the Nationality of Ships*, 54 Am. J. Int'l L. 25, 27 & n.7 (1960). Ordinarily, this disclosure occurs through some combination of carrying official documents on the vessel, flying the nation's flag, and entry in a national registry of vessels. *See* Meyers, *The Nationality of Ships* 177–78.

The smugglers' vessel offered none of these customary signs of nationality. It carried no documents, it flew no flag, and it had no name or identifying numbers that would permit entry into a national registry. No one on the vessel verbally claimed that it had any nationality, nor was the vessel "in a position to provide evidence" of any nationality, so it falls within the meaning of "vessel without nationality" in international law and under the Act. *Matos-Luchi*, 627 F.3d at 6 (internal quotation marks omitted).

Another provision of the Act points in the same direction. The Act describes three exclusive ways that a master or individual in charge may make a "claim of nationality or registry":

> A claim of nationality or registry under this section includes only—
> (1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;
> (2) flying its nation's ensign or flag; or
> (3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.

*Id.* § 70502(e); *see Obando*, 891 F.3d at 933. The smugglers and their boat could make no "claim of nationality or registry," and it is hard to see how a boat with no claims of nationality could be anything other than a vessel without nationality.

The smugglers' boat had no master or individual in charge who could make a verbal claim of registry under section 70502(e). During the interception of the boat, a Coast Guard officer asked the smugglers who was the master or individual in charge, and no one claimed to be. The evidence showed that the smugglers were equals; each man took turns driving the boat, and Martinez said everyone decided together to turn around when the boat started having engine problems. Martinez even laughed when a federal agent asked him if the boat had a captain. The record contains no evidence of a hierarchy among the smugglers.

The smugglers argue that their equality means either that they were *all* in charge or that they took turns being in charge. And at oral argument, counsel

14

argued that when no one has been designated as the individual in charge, the person currently navigating the boat is in charge. We disagree.

These arguments misunderstand maritime law. In this context, "individual in charge" refers to someone with authority over the vessel's personnel, not someone with temporary control of navigation. The Act pairs the words "master" and "individual in charge" because they bear associated meanings in a variety of maritime statutes. *See Home Depot U. S. A., Inc. v. Jackson*, 139 S. Ct. 1743, 1751 (2019); *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169–70 (2014); Scalia & Garner, *Reading Law* §§ 31, 39, at 195–98, 252–55.

In maritime law, an individual in charge of a vessel is someone with command authority. For example, one statute limits the circumstances in which "[a]n owner, charterer, managing operator, master, individual in charge, *or other person having authority*" may order an officer to take charge of a vessel's deck watch. 46 U.S.C. § 8104(a) (emphasis added). Another statute requires the "owner, charterer, managing operator, master, or individual in charge" to enter a written employment agreement with each seaman. *Id.* § 10302(a). And the seaman must sign the agreement "in the presence of the master or individual in charge." *Id.* § 10305(2). Another statute requires the "master or other individual in charge" of certain vessels to report complaints of sexual offenses to the government. *Id.* § 10104(a). And yet another requires "the master or individual in charge" to

15

provide a seaman with documents "[o]n discharging [him] and paying [his] wages." *Id.* § 10311(a).

The record also fails to support the smugglers' argument. When asked, no smuggler claimed to be in charge during the interception. That fact is inconsistent with the theory that everyone was in charge and with the theory that everyone took turns being in charge. Martinez denied ever being in charge when questioned later. And the record contains no other evidence to support either theory. The vessel lacked a master or individual in charge.

The smugglers argue that the vessel was not stateless because the Act specifies that a vessel lacks nationality when the master or individual in charge fails to make a claim of nationality "on request of an officer of the United States authorized to enforce applicable provisions of United States law," *id.* § 70502(d)(1)(B), and no request was made during the interception. But this requirement applies only when the master or individual in charge is aboard the vessel; here, no one was in charge. And section 70502(e) makes clear that only a master or individual in charge can make a verbal claim of registry; the Coast Guard was not required to ask the crew for such a claim.

We conclude that the district court had jurisdiction under the Act. The smugglers' vessel had no indicia of nationality: no registry papers, identification markings, flag, or verbal claim of nationality by anyone, let alone a master or

16

individual in charge. In the absence of any claim of registry, the vessel lacked nationality.

Our conclusion is consistent with our precedents. We have held that a vessel lacked nationality under the Act when it lacked indicia of nationality or registry, the captain concealed himself among the crew, and neither captain nor crew made a claim of nationality or registry when they were questioned. *United States v. De La Cruz*, 443 F.3d 830, 832 (11th Cir. 2006). We also have held that a district court had jurisdiction under the Act when a vessel "was not flying any flag and had no indicia of nationality." *De La Garza*, 516 F.3d at 1271–72 (internal quotation marks omitted). And we have held that jurisdiction existed when guardsmen could not identify a master and did not ask for the individual in charge; they instead asked each person on board for a claim of nationality, so "any individual who possessed the authority to make a claim of registry . . . was given the opportunity to do so at the request" of a Coast Guard officer. *United States v. Cabezas-Montano*, 949 F.3d 567, 589 n.14 (11th Cir. 2020).

To the extent customary international law prescribes procedures for determining whether a vessel is stateless, it does not undermine our conclusion. It is well established that a ship can have only one nationality; if it attempts to claim association with more than one nation for its own convenience, it loses association with any nation and becomes stateless. Convention on the High Seas art. 6.

17

Customary international law does not otherwise define the conditions under which a nation may conclude that a vessel is stateless or any examination necessary to reach that conclusion. The most important source, the Convention on the High Seas of 1958, provides that a nation's warship may visit a suspicious ship that falls within one of several categories (a ship suspected of piracy, for example), in large part to verify that ship's right to fly its flag. *Id.* art. 22(1)–(2). If suspicion persists, the warship may conduct "a further examination" aboard the ship. *Id.* But even in that context, the Convention does not specify how that examination must proceed, who may make a claim of nationality, or what conclusions to draw if the vessel lacks a master or individual in charge.

Scholarly articles and treatises also offer little guidance. For example, one scholar recently explained that an examination aboard a vessel suspected of statelessness "typically continues until either there are no longer any reasonable grounds for suspecting the vessel's claim of nationality or the examination is completed." Allen, *The Peacetime Right of Approach and Visit*, at 424. The article fails to mention any mandatory questions during an onboard examination or define the consequences for the nationality of a vessel if it lacks a master or individual in charge. Another article describes the controversy over what to do with a vessel that claims no registration as "far from settled" but argues that "the underlying philosophy" of customary international law requires a vessel to affirmatively claim

18

nationality and provide evidence supporting its claim. Andrew W. Anderson, *Jurisdiction over Stateless Vessels on the High Seas: An Appraisal Under Domestic and International Law*, 13 J. Mar. L. & Com. 323, 341 (1982). Likewise, a prominent treatise states that "a ship which obscures the cognoscibility of its [nationality] repeatedly, deliberately, and successfully may be treated as stateless." Meyers, *The Nationality of Ships* 351 (internal quotation marks omitted). But the treatise does not address whether a vessel deliberately obscures its nationality when it lacks a master or individual in charge and bears no flag or markings of nationality.

We acknowledge that the only other circuit to consider a similar set of facts reached the opposite conclusion, *United States v. Prado*, 933 F.3d 121, 130–32 & n.5 (2d Cir. 2019), but its reasoning fails to persuade us. The Second Circuit concluded that jurisdiction was lacking when three men in a go-fast boat, none of whom identified himself as the master, were not asked for a claim of nationality or registry. *Id.* It reasoned that "failure to volunteer a claim of nationality does not suffice" to create jurisdiction because the statute is clear that a vessel is stateless only if the master fails to claim registry upon request. *Id.* at 131. And it concluded that even if no one identified himself as the master, the Coast Guard should have asked each crew member if he wished to make a claim of nationality or registry. *Id.* at 131 & n.5. But *Prado*'s reasoning fails to grapple with the non-exhaustive nature

19

of the examples in section 70502(d)(1) or to consider the possibility that a vessel may not have a master or individual in charge.

### B. The District Court Was Not Obligated to Hold an Evidentiary Hearing on Jurisdiction, and Its Delayed Final Ruling Was Harmless Error.

The smugglers also argue that the district court erred when it declined to hold an evidentiary hearing. They argue that the Confrontation Clause required an evidentiary hearing so that they could cross-examine the government's witnesses and call their own witnesses. And they argue that the Act itself requires an evidentiary hearing on jurisdiction. We reject both arguments.

The Confrontation Clause does not require an evidentiary hearing because the Act makes clear that jurisdiction is a "preliminary question[] of law to be determined solely by the trial judge"; it is not an element of the crime. 46 U.S.C. § 70504(a). For that reason, we have previously held that the admission of documentary evidence to prove jurisdiction under the Act, without affording the defendant an opportunity to cross-examine the declarant, does not violate the Confrontation Clause. *United States v. Campbell*, 743 F.3d 802, 806 (11th Cir. 2014).

The Act too does not oblige a district court to hold an evidentiary hearing in every prosecution under the Act. The smugglers identify no language in the Act that creates such a requirement, and we do not see any.

20

The smugglers point to three decisions as suggesting the need for an evidentiary hearing, but none supports their argument. In *United States v. Iguaran*, we remanded for additional factual development because the record contained no facts supporting jurisdiction, but we did not require the district court to hold an evidentiary hearing. 821 F.3d 1335, 1337–38 (11th Cir. 2016). We instead instructed the district court to provide the parties with "an opportunity to submit evidence" about jurisdiction. *Id.* at 1338 (internal quotation marks omitted). In *United States v. Aikins*, the Ninth Circuit held that a district court must allow "a full presentation of the evidence" if a jurisdictional fact is disputed. 923 F.2d 650, 657 (9th Cir. 1990). But the smugglers never identified a jurisdictional fact they disputed, and in any event, the Ninth Circuit later superseded that opinion on rehearing with a new opinion that lacks the language the smugglers rely upon. *See United States v. Aikins*, 946 F.2d 608 (9th Cir. 1990). The last decision the smugglers cite does not address evidentiary hearings at all; it addresses whether a jurisdictional question under a different statute should have been submitted to the jury. *Gough v. Rossmoor Corp.*, 487 F.2d 373, 376–77 (9th Cir. 1973).

A district court does not abuse its discretion when it declines to hold an evidentiary hearing in the absence of a factual dispute or proffer of evidence to be presented by the requester of the hearing. *See United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000). The smugglers have never identified any facts proved

21

by the government that they contest. Nor have they identified additional evidence they wanted to introduce at an evidentiary hearing. The district court did not abuse its discretion by declining to hold a hearing about uncontested facts.

The smugglers also argue that the district court erred by waiting until the end of the trial to make a final determination of jurisdiction, but any error was harmless. To be sure, the district court was obliged to determine whether it had jurisdiction before the trial started; after all, the Act refers to jurisdiction as a "preliminary question[]." 46 U.S.C. § 70504(a). The district court made only a provisional finding of jurisdiction before trial as a concession to the smugglers to allow them to cross-examine the witnesses for the prosecution about jurisdiction during trial. After the smugglers failed to do so and otherwise failed to introduce any new evidence about jurisdiction, the district court made a final determination of jurisdiction immediately before the jury began deliberating. The smugglers suffered no prejudice from the delay of that ruling.

*C. Sufficient Evidence Supported the Convictions of Martinez, Garcia, and Enriquez.*

Martinez, Garcia, and Enriquez argue that the government failed to present sufficient evidence at trial that they knew they were transporting drugs. We disagree. Martinez and Enriquez admitted during their interrogations in Mobile that they knew they were agreeing to transport drugs before they left the Dominican

22

Republic. And Garcia made incriminating statements that stopped just short of admitting to knowledge.

Admissions of knowledge aside, the men were in a small boat that contained nothing but fuel, 400 pounds of cocaine, and a few personal items. There was little room for anything else. And they were promised a lot of money for the trip.

Sufficient circumstantial evidence of knowledge exists when the government proves the obvious presence of a large quantity of contraband, a lengthy voyage, and suspicious behavior surrounding apprehension. *Tinoco*, 304 F.3d at 1123. By any measure, 400 pounds of cocaine, worth about $25 or $30 million, is a large quantity of contraband. And the smugglers' journey had already stretched for five or six days. The contraband was obvious because it was in the open on the deck. The boat had no other supplies or equipment to explain why it was 50 nautical miles from shore. And the crew engaged in suspicious behavior by traveling at night with no navigational lights and attempting to destroy the contraband when the Coast Guard arrived. *See United States v. Cruickshank*, 837 F.3d 1182, 1189–90 (11th Cir. 2016).

Martinez and Garcia argue that the government needed to prove that they knew they were transporting cocaine. The indictment alleged that they "did willfully, knowingly and unlawfully conspire with each other . . . to distribute and

23

possess with the intent to distribute approximately 182 kilograms of cocaine." We take the opportunity to clarify our precedents on this issue.

Ordinarily, controlled-substance offenses require the government to prove the defendants' mens rea only with respect to controlled substances generally. *United States v. Lewis*, 676 F.2d 508, 512 (11th Cir. 1982). In the context of the Act, for example, the government ordinarily must prove only that the defendants knew they were transporting a controlled substance, not that they knew the controlled substance was cocaine. *See* 46 U.S.C. § 70503(a)(1).

We departed from this longstanding rule in *United States v. Narog*, 372 F.3d 1243 (11th Cir. 2004). An indictment charged several defendants with conspiring to possess and distribute pseudoephedrine "knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, that is, methamphetamine." *Id.* at 1246; *see* 21 U.S.C. § 846. The district court instructed the jury that "the government need not prove that a Defendant knew or had reasonable cause to believe the exact nature of the controlled substance to be manufactured," and that it needed to prove only that "a Defendant knew or had reasonable cause to believe that the pseudoephedrine would be used to manufacture *some* controlled substance." *Narog*, 372 F.3d at 1247 (emphasis added) (internal quotation marks omitted). We reversed, holding that the language the government used in the indictment required it to prove that

24

the defendants knew the pseudoephedrine would be used to manufacture methamphetamine and that the judge constructively amended the indictment by instructing the jury otherwise. *Id.* at 1247–50. We reasoned that by including the identity of the controlled substance in the indictment, "the government essentially charged a subset of the statutory crime," so the district court "'altered an essential element of the crime charged'" when it instructed the jury otherwise. *Id.* at 1249.

*Narog* is contrary to our earlier precedents. *Narog* reasoned that the government was required to prove mens rea with respect to the specific controlled substance at issue because the indictment charged a subset of the offense. 372 F.3d at 1249. A subset offense is one in which "the elements of the [subset] offense are a subset of the elements of the charged offense." *Schmuck v. United States*, 489 U.S. 705, 716 (1989). And an element is any fact that must be proven to the jury, *Apprendi v. New Jersey*, 530 U.S. 466, 477–78 (2000). But our prior panel precedents make clear that a defendant's mens rea with respect to the identity of the controlled substance is not an element of a controlled-substance offense; the indictment therefore did not charge a subset offense. *Narog* depends on the opposite conclusion, so it is inconsistent with our earlier decisions.

Two decisions that predate *Narog* make this point especially clearly. Our predecessor court held in *United States v. Restrepo-Granda* that "knowledge that the substance [at issue] is a particular narcotic need not be proven," and that

25

"knowledge that such substance is a controlled substance" would suffice. 575 F.2d 524, 527 (5th Cir. 1978). The indictment in question charged that the defendant "'knowingly and intentionally did unlawfully possess [with] intent to distribute approximately 1943.6 grams of Cocaine-Hydrochloride.'" *Id.* at 526. So, long before *Narog*, we held that the mens rea with respect to the specific controlled substance was not an element of the crime. Likewise, we held in *United States v. Gomez* that "a defendant need not be found to know the particular drug involved in order to receive" the enhanced penalties for some drugs that apply under one statute, 21 U.S.C. § 841(b)(1). 905 F.2d 1513, 1514 (11th Cir. 1990). The indictment in *Gomez* charged the defendant with possession of cocaine and possession with intent to distribute cocaine. *Id.* So *Gomez* makes clear that, even keeping in mind the principle that "the core crime and [any] fact[s] triggering [a] mandatory minimum sentence together constitute a new, aggravated crime, each element of which must be submitted to the jury," *Alleyne v. United States*, 570 U.S. 99, 113 (2013), mens rea with respect to the specific controlled substance is not an element of the crime.

These holdings are inconsistent with the holding in *Narog* that an indictment can charge a subset offense that requires it to prove knowledge of the specific controlled substance at issue. *Narog*, 372 F.3d at 1249. The indictment could not have charged such a subset crime because knowledge of the specific controlled

26

substance is not an element of a controlled-substance offense. *Gomez*, 905 F.2d at 1514; *Restrepo-Granda*, 575 F.2d at 527. When two decisions conflict, the earlier decision controls. *U.S. Sec. & Exch. Comm'n v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004); Bryan A. Garner et al., *The Law of Judicial Precedent* § 36, at 303 (2016). To be sure, no one appears to have raised a subset or constructive amendment argument in *Restrepo-Granda* or *Gomez*. But the "argument that [*Narog*] should not be [controlled] by [those decisions] because this point was not really argued in th[ose] case[s] runs afoul of our decisions that a prior panel precedent cannot be circumvented or ignored on the basis of argument not made to or considered by the prior panel." *Tippitt v. Reliance Std. Life Ins. Co.*, 457 F.3d 1227, 1234 (11th Cir. 2006). *Narog* is not binding, and we reject the smugglers' argument that the government failed to supply required proof that they knew they were transporting cocaine.

We distinguished *Narog* in two later decisions, but neither affects our conclusion today. In each decision, we concluded, notwithstanding *Narog*, that the indictment did not require proof of the mens rea with respect to the specific substance mentioned in the indictment. *United States v. Achey*, 943 F.3d 909, 912, 915–16 (11th Cir. 2019); *United States v. Sanders*, 668 F.3d 1298, 1311–12 (11th Cir. 2012). Their outcomes, and the reasoning necessary to those outcomes that the indictments did not require proof of knowledge of the type of controlled substance,

27

are thus consistent with our older decisions. *See* Garner et al., *The Law of Judicial Precedent* § 4, at 44–45. And neither decision attempted to reconcile *Narog* with our earlier precedents.

### D. The District Court Did Not Deprive Martinez, Garcia, or Enriquez of a Meaningful Opportunity to Present a Complete Defense.

The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Martinez, Garcia, and Enriquez argue that the district court deprived them of this right when it prohibited them from cross-examining the government's witnesses about more than the basic details of their 10-day outdoor confinement on the *Richard Dixon*. But the district court did not infringe on their right, and alternatively any error was harmless.

The right to a meaningful opportunity to present a complete defense is "subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). An evidentiary ruling may violate the right if it "infringe[s] upon a weighty interest of the accused." *Holmes*, 547 U.S. at 324 (alteration adopted) (internal quotation marks omitted). But an evidentiary ruling does not infringe a weighty interest because the excluded testimony only "would have been helpful." *United States v. Gillis*, 938 F.3d 1181, 1195 (11th Cir. 2019). Nor does an evidentiary ruling infringe on a defendant's rights when it prevents him merely from "increas[ing] the quantity of witnesses who would tell the jury what other

28

witnesses already said." *United States v. Mitrovic*, 890 F.3d 1217, 1222 (11th Cir. 2018).

The district court prevented the smugglers only from introducing cumulative evidence, so it did not infringe their weighty interests. It allowed Garcia's counsel to elicit testimony that the smugglers were confined on the deck of the Coast Guard cutter and that they might have been shackled. And the record contained evidence that the smugglers were aboard the cutter for 10 days. After the government objected to additional cross-examination on the point, the district court ruled that the time aboard the *Richard Dixon* was too remote from the interrogation to bear strongly on the credibility of the smugglers' confessions, so the matter did not warrant further cross-examination. To be sure, absent an instruction to move on, the smugglers could have asked additional questions of the same Coast Guard officer or asked the same questions of other Coast Guard witnesses. But the district court allowed the smugglers to place the key facts before the jury, so it did not violate the smugglers' right to defend themselves. *Id.*

Even if it had, any error was harmless. A constitutional error may be harmless if there was ample evidence to convict absent the error. *United States v. Pon*, 963 F.3d 1207, 1239–40 (11th Cir. 2020). The government presented a video recording from the patrol plane, credible testimony that the smugglers attempted to throw the cocaine overboard when the Coast Guard approached, the confiscated

29

cocaine, photos of the boat showing that the smugglers sat just inches away from the cocaine, and expert testimony that the smugglers' behavior was typical of cocaine importation from Colombia through the Dominican Republic into Puerto Rico. And the smugglers were able to introduce "the essence of" the desired testimony. *United States v. Harris*, 916 F.3d 948, 959 (11th Cir. 2019). They introduced evidence that they were held on the deck of the *Richard Dixon*, that they might have been shackled, and that they were intercepted at sea on December 24 and were not put ashore until January 3. Those facts were enough to permit them to challenge the credibility of their interrogations.

## IV. CONCLUSION

We **AFFIRM** the smugglers' convictions.