[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-14461

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

FERDINAND MEDIKO,
a.k.a. Fred Mediko,
MONIKA MEDIKO,
PAULINE MEDIKO BADIKI,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

D.C. Docket No. 1:17-cr-00342-ELR-AJB-2

————————————————

Before JORDAN and ROSENBAUM, Circuit Judges, and SCHLESINGER,[*] District Judge.

PER CURIAM:

Defendants-Appellants Pauline Badiki, her brother Ferdinand Mediko, and his wife Monica Mediko were convicted of fraud and conspiracy to commit fraud. Their convictions stem from their involvement in buying Special Supplemental Nutrition Women, Infants and Children ("WIC") vouchers for cash from WIC recipients and then collecting the funds for those vouchers from the federal government. Appellants accomplished the purchase of the vouchers through their family business, Poly-Plex Pharmacy located in Atlanta, Georgia. Although Appellants raise various issues on appeal, after a thorough review of the record, and with the benefit of oral argument, we affirm their convictions and sentences.

## I.    Background

Under the WIC program, the United States Department of Agriculture uses funding to provide supplemental food, health-care referrals, and nutrition for low-income pregnant and postpartum women, and children up to age five who are considered

———————————————

[*] The Honorable Harvey Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

nutritionally at risk.  WIC recipients use WIC vouchers to pay for identified food products and prescription baby formula.  More specifically, recipients use paper vouchers for certain food items and for indicated maximum dollar amounts.  When a vendor accepts a WIC voucher, it writes redemption amounts matching the shelf price of the item, on the voucher.  The vendor provides the item, stamps the voucher, and the recipient signs it, allowing the vendor to deposit the voucher for currency that the United States pays.

Poly-Plex became an authorized store accepting WIC vouchers beginning in November 2005, after its then-owner Ms. Badiki[1] participated in required training classes, passed evaluations, and signed WIC vendor agreements.[2]  These agreements set forth the responsibilities of Poly-Plex.  They also warned that WIC vouchers could not be purchased or sold; they could only be redeemed for WIC-eligible items.  Besides, that, the signed agreements memorialized Poly-Plex's responsibility to ensure that all its staff were properly trained and aware of the WIC program guidelines.

In October 2011, a Georgia Department of Public Health investigator, Heather Jewell, conducted a monitoring visit at Poly-Plex, which resulted in the issuance of a probation letter.  During

---

[1] Appellants contend that the ownership of Poly-Plex changed from Ms. Badiki to Mr. Mediko sometime in 2009.

[2] Badiki signed agreements in 2005, 2007, and 2010.  Mr. Mediko signed a WIC program acknowledgment agreement in 2010.

the visit, Investigator Jewell informed Mr. Mediko, who was identified as the owner, of various deficiencies.

A couple months later, in December 2011, Investigator Jewell conducted a second visit to Poly-Plex and requested all WIC vouchers. Mr. Mediko spoke to Investigator Jewell and said that business was slow, so he had no WIC vouchers available. According to Mr. Mediko, his Electronic Benefits Transfer ("EBT") machine had not been working for a week, and that explained the lack of vouchers. But this explanation made no sense to Investigator Jewell because WIC vouchers are not processed with EBT terminals. At the end of the December 2011 visit, Investigator Jewell again noted several deficiencies, including that Poly-Plex offered only limited qualifying food items, and other WIC-approved items were not available at the store.

Several more months passed. Then, beginning in August 2012, investigators conducted undercover operations at Poly-Plex to determine whether it was exchanging cash for WIC vouchers. The investigation revealed that on various occasions, someone from Poly-Plex exchanged cash for WIC vouchers. To conduct the investigation, the Department of Agriculture enlisted the undercover cooperation of Amanda Brent, whom the Department had caught previously selling her WIC vouchers for cash. At trial, Ms. Brent testified about her participation in four undercover sales of WIC vouchers to Poly-Plex. As Ms. Brent narrated, the United States played surveillance videos of those sales.

Ms. Brent explained that when she first approached Mrs. Mediko inside Poly-Plex to sell WIC vouchers, Mrs. Mediko repeatedly asked who told her that Poly-Plex would exchange vouchers for cash, so Ms. Brent identified a person to "familiarize" herself with Mrs. Mediko.  During all but one of the undercover transactions, Ms. Brent gave her WIC vouchers to Mrs. Mediko inside Poly-Plex.  Mrs. Mediko then went to the back office to collect cash from Mr. Mediko in exchange for the WIC vouchers. During her visits to Poly-Plex to sell vouchers, Ms. Brent said, Mr. Mediko was "always there." This sequence changed only once in November 2012, when Mrs. Mediko told Ms. Brent that she would let her know when Mr. Mediko returned, and she would give her the money then.

Videos of the undercover transactions revealed Mrs. Mediko took precautions when she exchanged the vouchers for cash.  For example, Mrs. Mediko walked outside the store to pay Ms. Brent on multiple occasions.  And Ms. Brent explained that "[s]ometimes [Mrs. Mediko] would put [cash] inside the actual WIC folder. Sometimes she would discreetly pass it over to me inside the store." The jury also heard a recorded telephone call between Mrs. Mediko and Ms. Brent.  During that call, Mrs. Mediko asked Ms. Brent to "lie to [her] doctor" and tell the doctor that her baby was throwing up, so that the doctor would prescribe Peptamen, which had a "higher dollar amount on that voucher."  No evidence revealed that Ms. Badiki was present at Poly-Plex during any of the undercover transactions.

The undercover investigation culminated in federal agents' execution of a search warrant at Poly-Plex in June 2013. Among others, Investigator Jewell and Special Agent Fred McCree from the Office of Investigations at the United States Department of Agriculture were present for the search. Agent McCree found various documents, including evidence that Ms. Badiki wrote checks for Mr. Mediko and other Poly-Plex employees to facilitate WIC transactions. In one instance, Ms. Badiki logged a check in a ledger as "cash Fred for WIC, in the amount of $400." Agent McCree also collected invoices and receipts for purchases of WIC items made by Poly-Plex. But the dollar amounts of those purchases did not match the amount of inventory necessary to correlate with the WIC voucher redemption amounts.

During the execution of the search warrant, Mrs. Mediko agreed to speak with investigators. She denied multiple times that she bought WIC vouchers. Even after being shown one of the undercover videos depicting her transactions, Mrs. Mediko still denied that she had bought WIC vouchers for cash.

## II.    Fraudulent Invoices

After the execution of the search warrant, Ms. Badiki and the Medikos requested to meet with the government to discuss the evidence against them. The government provided defense counsel with evidence demonstrating that Poly-Plex's expenses relating to WIC-eligible products did not comport with its substantially higher WIC voucher-redemption amounts. In the government's view, this indicated fraud.

Following one of these meetings in February 2015, Mr. Mediko's attorney, Bruce Morris, provided additional documents to the government in a box which Agent McCree picked up from Mr. Morris's office. Agent McCree later reviewed the documents and determined that a large quantity of invoices in the box—which reflected more than $1 million in purported WIC-eligible expenses for Poly-Plex—appeared suspicious. So the government contacted multiple vendors listed on the invoices. These vendors confirmed that the invoices were fabricated and that they had not shipped any products to Poly-Plex. In April 2015, the government informed defense counsel that hundreds of invoices counsel had provided to Agent McCree had been fabricated.

Fast-forward two-and-a half years. In September 2017, a federal grand jury returned an indictment charging Ms. Badiki and the Medikos with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, along with substantive charges of wire fraud, in violation of 18 U.S.C. §§ 1342 and 2; theft of government funds, in violation of 18 U.S.C. §§ 641 and 2; and fraud involving public money, in violation of 42 U.S.C. § 1760(g) and 18 U.S.C. § 2. The indictment alleged that the defendants had engaged in a scheme to defraud the government by purchasing WIC vouchers from individuals for cash and later redeeming those vouchers for a higher sum of money.

Once a trial date was set, the parties discussed the implication of the box of fraudulent invoices. As a result of that discussion, Mr. Morris expressed interest in entering into a stipulation with the

government about that evidence. Although the government circulated a proposed stipulation, the parties did not reach an agreement at that time.

But during a pretrial conference held on November 13, 2019, the government informed the district court about the fraudulent invoices and the parties' discussion of a stipulation. The government said that it planned to admit the box of invoices at trial through Agent McCree's testimony, but it was attempting to reach a stipulation with the defendants so it could avoid the need for Agent McCree to testify that he received the documents from Mr. Morris. When the district court asked Mr. Morris for his response, he said, "I didn't fabricate any documents . . . . They are not suggesting I did. Just for the record." Mr. Morris continued, "I think it's reasonable of the government to try and do it this way. . . . I'd rather they not include my name or any suggestion that it came from my client, because that is not factually accurate." Mrs. Mediko's lawyer indicated his agreement with Mr. Morris, and counsel for Ms. Badiki stated that he needed more time to discuss and consider the stipulation.

The following day, the court entered an order relating to trial matters. Among other things, the order set forth the following stipulation: "The Parties stipulate that a box of documents containing 'fabricated' invoices was provided to the Government by a representative of Defendants."

On the morning of the first day of trial, December 2, 2019, the defendants filed a joint motion to exclude the box of invoices

under Rule 11 of the Federal Rules of Criminal Procedure and Rules 403 and 410 of the Federal Rules of Evidence. After jury selection, the district court heard arguments on the motion to exclude.

The government initially said that it thought the parties had reached an agreement on a stipulation—until the motion to exclude had been filed. Still, though, the government agreed that the parties had not yet entered a formal stipulation. It also explained that, without a stipulation, Agent McCree would testify that he had received the documents from Mr. Morris. So the government proposed the stipulation to eliminate the issue of having to put Mr. Morris on the stand.

Mr. Mediko's counsel, Mr. Morris, pointed out that if the district court granted the motion to exclude, that would eliminate any issue about the stipulation. But, he noted, if the court denied the motion, Mr. Morris would reaffirm his agreement to the stipulation. Still, he expressed concern that if a defendant took the stand and "testifie[d] to something that is not the same as my recollection, then someone is going to need to put me on the witness stand. And that's going to create a significant problem."

Counsel for Ms. Badiki argued that the box of documents should be excluded under both Rules 410 and 403. Nevertheless, he said he would agree to the stipulation if the court were to deny the motion to exclude. Meanwhile, one of Mrs. Mediko's attorneys objected to entering into a stipulation.

Having heard the parties' positions, the district court expressed concern that, without a stipulation, the jury would be confused about where the documents came from. And that might mean that Mr. Morris would have to testify, "which [the judge said,] 'I'm not going to do.'" The court allowed the government to file a written response to the motion to exclude and took the matter under advisement.

After reviewing the government's response, the district court continued the discussion of the motion to exclude. The court clarified that it did not believe that Rule 410 protected the box of invoices, but it intended to exclude the evidence under Rule 403 because of the "good possibility" that Mr. Morris would have to testify. The court reiterated its fear that, if the parties did not resolve the stipulation, "we will get ourselves to a point where we have no choice but to put Mr. Morris on the stand, which we simply can't do." The court revisited where the parties stood about the stipulation. In response, they expressed that they had come to a resolution.

Ultimately, the parties agreed on the language of a stipulation relating to the box of documents. It stated,

> The United States of America, by and through its undersigned attorneys, and defendants Pauline Badiki, Ferdinand Mediko, and Monica Mediko, by and through their undersigned attorneys, hereby stipulate that in March 2015, a

representative of the defendants pro-
vided a number of invoices, which are
collectively marked as Government's
Exhibit Number 850, to the United
States Department of Justice and the
U.S. Department of Agriculture. These
invoices were represented to be busi-
ness records maintained in the ordinary
course of business at Poly-Plex Phar-
macy. The jury may accept these facts
as proven.

Counsel for the parties signed the stipulation, but the individual
defendants did not.

Despite the agreement, Mrs. Mediko's counsel said that his
client had no knowledge of any false documents in the box. He
thought it would be unfair for the government to argue that Mrs.
Mediko had a consciousness of guilt based on the document pro-
duction. So he asked the district court to instruct the government
to refrain from arguing consciousness of guilt, threatening to oth-
erwise call Mr. Morris as a witness.

The court declined. It agreed with the government that the
government could argue certain inferences and deductions that
could be drawn from circumstantial evidence. Mrs. Mediko's at-
torney represented for the record that, given that the court was
ruling against his motion, were he so permitted, he would have
called Mr. Morris as a witness to ask him how he got the box of
documents. Counsel further proffered that he would have asked

Mr. Morris, "Do you have any information at all that Ms. Mediko had any knowledge, involvement, consent in, any party to a crime, any conspiracy, anything to know what's in those documents? And I believe the answer would be: No, I do not." The district court again said that it would not allow Mr. Morris to testify and emphasized that a stipulation had been entered.

### III.    Trial

Besides Investigator Jewell and the undercover purchaser, Ms. Brent, a few WIC recipients also testified at trial. They admitted that they had sold WIC vouchers to Poly-Plex employees for cash. One such witness, Yvette Jackson, testified that she met all three appellants. And similarly to Ms. Brent, explained that when she first appeared at Poly-Plex to sell her vouchers, Mrs. Mediko vetted her by asking how she knew about the store. Ms. Jackson stated that she gave WIC vouchers to Mr. Mediko for cash "numerous times" and, while Ms. Badiki was not present during these exchanges, Mr. Mediko would ask Ms. Badiki to bring cash that he would give to Ms. Jackson.

Agent McCree testified about Poly-Plex's bank records, which the government obtained by subpoena. These records showed that Ms. Badiki had signed hundreds of checks on behalf of Poly-Plex from 2009 to 2013, some of which were made out to cash with "WIC" written in the memo line. And surveillance photos and signed deposit slips established that Ms. Badiki deposited the fraudulent WIC vouchers charged in the indictment into one of Poly-Plex's bank accounts. On a few occasions, the evidence

showed, Ms. Badiki crossed out the redemption amount listed on the voucher, wrote a new dollar amount, and placed her initials on the voucher.

Agent McCree also explained that during the undercover transactions involving Ms. Brent, he was across the street from Poly-Plex and Ms. Brent gave him the cash she received in exchange for her WIC vouchers. And he noted that a deposit slip for one of the transactions had the initials "P.B." (Ms. Badiki's initials) on it. Much of Agent McCree's testimony, though, centered on his analysis of Poly-Plex's WIC redemptions and invoices. He compared Poly-Plex's redemptions from 2009 to 2013 to much larger grocery-store chain locations within a few miles of Poly-Plex, like Publix, Kroger, and Walmart. In comparison, Agent McCree found that Poly-Plex's redemptions ($6.5 million) were more than triple its closest competitor (less than $2.1 million).

Agent McCree testified that he attempted to calculate Poly-Plex's expenses by collecting records from its vendors for the relevant period. He said he had reviewed hundreds of pages of bank records and invoices and thousands of redemptions. But when Agent McCree compared Poly-Plex's WIC redemption amounts with its expenses, he found the WIC redemption amounts exceeded Poly-Plex's expenses by approximately $5 million. Even when crediting-Poly-Plex with some non-WIC eligible item expenses and with a 100% profit markup for potential WIC-eligible items, Agent McCree's analysis showed an unexplained gap of approximately $4 million between the amount in WIC redemptions

that Poly-Plex had claimed and the value of WIC-eligible goods that it had provided to customers.

Finally, aside from the documents seized on the day the search warrant was executed, Agent McCree explained that he received an additional box of invoices on a later date. At this point, the government read the parties' stipulation with respect to the box of invoices—indicating that each defendant stipulated that "in March 2015, a representative of the defendants provided a number of invoices." Agent McCree estimated that the box contained several hundred invoices purporting to show purchases of WIC-eligible items, reflecting a total of approximately $1 million in infant-formula purchases. As Agent McCree explained, he had not seen these same invoices when he participated in the execution of the search warrant in 2013. Agent McCree explained that he subpoenaed the vendors who allegedly provided baby formula to Poly-Plex, providing them with copies of the invoices. Representatives of the two vendors testified that the invoices were not authentic, and one vendor had never even had an account with Poly-Plex.

For its part, the defense put on witnesses who worked as delivery drivers for Poly-Plex. They testified that they never purchased WIC vouchers for cash but said instead that they delivered WIC items in exchange for vouchers. One such driver said that Poly-Plex paid her a ten-percent cash commission based on the vouchers that she filled. A former Poly-Plex driver, Jonathan Shinholster, admitted that on one occasion, while making deliveries for Poly-Plex, he bought a WIC voucher for cash. When Ms.

Badiki learned that he had done so, Mr. Shinholster recalled, she fired him. But Mr. Shinholster agreed that Poly-Plex later rehired him to deliver prescriptions.

The defense also called former Poly-Plex employee Patricia Okoli. She testified that she was not aware of anyone who came into the store and sold WIC vouchers for cash. She also attempted to explain the existence of the fraudulent invoices. According to Ms. Okoli, a co-worker lost a box of paperwork, invoices, and receipts. So, Ms. Okoli testified, she and the co-worker created replacement invoices by researching where Poly-Plex bought its products and obtaining information on Google. They then printed the fraudulent invoices out on a printer they bought for this purpose. Ms. Okoli further said that she confessed to Mr. Mediko for the first time during trial that she had falsified the invoices. According to Ms. Okoli, when Mr. Mediko learned about this, Mr. Mediko and Ms. Badiki were upset, and Mr. Mediko asked her to testify at trial. Ms. Okoli denied that anyone at Poly-Plex had asked her to create the invoices, and she said she did not know what happened to the box of documents after she created them.

At the close of the evidence, all three defendants moved to dismiss the case against them under Rule 29. The district court denied the motions.

Then the parties offered their closing arguments, during which the government referenced the box of falsified invoices. It argued that, after the government executed the search warrant, "the defendants provided a box filled with fabricated invoices in a

desperate effort" to conceal their fraud.  Similarly, the government noted, "when the defendants knew they were caught, they provided invoices that were completely fabricated."

Later, when discussing the evidence supporting Ms. Badiki's guilt, the government highlighted what it deemed to be the "somewhat remarkable testimony" from Ms. Okoli and noted that the invoices suspiciously corresponded to the years that were under investigation.  The government emphasized that no dispute existed that "a representative of the defendants provided that box."  Next, when discussing evidence supporting Mr. Mediko's guilt, the government argued that Mr. Mediko "knew he had been caught, and he knew that the truth itself could not explain that gap.  That's not an act of an innocent person unaware of the purchase of vouchers at Poly-Plex."  Finally, when summing up the evidence, the government stated that "[t]he defendants each attempted to hide the truth, both in terms of lying to investigators and then you heard the acts of delivering the fabricated invoices to the government."

At the end of the government's closing argument, Mr. Mediko's counsel moved for a mistrial based on the comments about the box of fabricated invoices.  The district court denied the motion, explaining that it did not take the government's argument to be "singling out a [particular] defendant."  Each defendant then addressed the box of invoices in closing argument, each denying that he or she had anything to do with the creation of the documents.

The jury found Ms. Badiki and the Medikos guilty of each count.

### IV.    Ms. Badiki's Claims

Ms. Badiki raises three issues on appeal.  One challenges the sufficiency of the evidence against her.  The remaining two take issue with the district court's application of sentencing enhancements.

### A.    Sufficiency of the Evidence

First, Ms. Badiki claims no direct evidence demonstrated her involvement in purchasing WIC vouchers or that she knew that the Medikos were doing so.  Mostly, Ms. Badiki contends she gave up control and ownership of Poly-Plex to Mr. Mediko at around the same time the purported conspiracy began.  She notes that she was rarely at the pharmacy and was not present when the government conducted site inspections and undercover transactions, or when it executed the search warrant.  And, Ms. Badiki continues, no evidence showed that she interacted with the WIC recipients who sold their vouchers.

To convict a defendant of wire fraud, the government must present proof beyond a reasonable doubt that "the defendant (1) participated in a scheme or artifice to defraud; (2) with the intent to defraud; and (3) used, or caused the use of, interstate wire transmissions for the purpose of executing the scheme or artifice to defraud." *United States v. Machado,* 886 F.3d 1070, 1082–83 (11th Cir. 2018) (citation and internal quotation marks omitted).  A jury may infer intent to defraud from the defendant's conduct and circumstantial evidence. *Id.* at 1283.

To convict a defendant of conspiracy, the government must prove beyond a reasonable doubt "(1) an agreement among two or more persons to achieve an unlawful objective," (here, theft of federal funds); "(2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003); *see also United States v. Feldman*, 931 F.3d 1245, 1257 (11th Cir. 2019).

We review *de novo* the sufficiency of the evidence to support a conviction and the denial of a Rule 29 motion for judgment of acquittal. *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011). In so doing, we view all evidence "in the light most favorable to the government and draw[] all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Grzybowicz*, 747 F.3d 1296, 1304 (11th Cir. 2014) (citation and internal quotation marks omitted). We will disturb a jury's verdict only if "no reasonable juror could have concluded beyond a reasonable doubt that the defendant was guilty." *United States v. Townsend*, 630 F.3d 1003, 1009 (11th Cir. 2011). Reasonable inferences, drawn from circumstantial evidence, are sufficient to support a guilty verdict. *United States v. Martin*, 803 F.3d 581, 587–88 (11th Cir. 2015).

Here, sufficient evidence exists to support Ms. Badiki's convictions. First, the evidence showed that Ms. Badiki signed Poly-Plex's WIC vendor applications, training records, and WIC program agreements in 2005, 2007, and 2010. And in the various

applications and agreements, Ms. Badiki identified herself as president or manager of Poly-Plex. Even in a September 2010 reauthorization form, Ms. Badiki listed her title as "manager." By signing the forms, Ms. Badiki agreed that she would be held "fully accountable" for ensuring that every Poly-Plex employee followed WIC program rules. Based on inspections and communications, Ms. Badiki would have been aware that, in May 2007, the Department of Agriculture identified Poly-Plex as a "high risk" vendor.

The evidence also supported the conclusion that Ms. Badiki had control over the business's finances during the relevant time frame (2009–2013). During his testimony, Agent McCree spoke of his review of Poly-Plex's bank records, including canceled checks from 2009 to 2013 reflecting that Ms. Badiki signed checks on behalf of the business. Indeed, Bank of America records showed that Ms. Badiki had signed hundreds of checks, many of which were paid to Poly-Plex vendors, some to delivery drivers, and some made out to cash with "WIC" written in the memo line. Likewise, documents revealed that Ms. Badiki had signature authority for Poly-Plex's JP Morgan Chase and Wells Fargo accounts. These records refuted Ms. Badiki's defense that she had no control over Poly-Plex once she turned the business over to Mr. Mediko.

We do not suggest that Ms. Badiki's management of the business and control of its finances would alone connect her to the WIC-fraud conspiracy. But importantly, surveillance photos and signed deposit slips established that Ms. Badiki deposited the specific fraudulent WIC vouchers charged in the indictment into Poly-

Plex's bank account at Bank of America between January 25 and February 5, 2013.  Other evidence also supported the conclusion that Ms. Badiki knew the true nature of the vouchers.  For example, on a few occasions, Ms. Badiki crossed out the redemption amount listed on a voucher, wrote a new dollar amount, and placed her initials on the voucher.  And although none of the witnesses said that Ms. Badiki gave them money for WIC vouchers, Yvette Jackson implicated Ms. Badiki in the scheme.  Ms. Jackson stated that on some occasions, Mr. Mediko asked Ms. Badiki to bring him cash that he then gave Ms. Jackson for the sale of her vouchers.  This testimony was substantiated by other evidence that showed that, in at least one instance, Ms. Badiki logged in a check ledger "cash Fred for WIC, in the amount of $400."

But perhaps the most incriminating evidence against Ms. Badiki was Agent McCree's testimony comparing Poly-Plex's WIC redemption amounts with its expenses.  Even with a substantial profit markup for potential WIC-eligible items and even giving Poly-Plex credit for costs associated with obtaining non-WIC-eligible items, Agent McCree found an unexplained gap of approximately $4 million between the amount of WIC redemptions Poly-Plex claimed and the value of WIC-eligible goods that it allegedly provided to customers.

This disparity is especially significant, given that Ms. Badiki controlled the business finances, wrote checks to place orders with vendors, and deposited the WIC vouchers in Poly-Plex's bank accounts.  A reasonable jury could conclude that Ms. Badiki was

aware of the amount Poly-Plex spent on WIC-eligible goods and the amounts Poly-Plex received from the federal government once the WIC vouchers were redeemed. *See Machado*, 886 F.3d at 1083–84. And the disparity was staggering—in the millions. Plus, Poly-Plex was a small mom-and-pop store. So the $4 million disparity weighs even more heavily against Ms. Badiki.

Taking the evidence in the light most favorable to the government, we conclude that the evidence was sufficient to support the jury's convictions of Ms. Badiki. *See United States v. Capers*, 708 F.3d 1286, 1297 (11th Cir. 2013) (In reviewing a sufficiency claim, this Court should not overturn a jury verdict "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt.") (citation and internal quotation marks omitted).

We have explained that a defendant may be found guilty of conspiracy if "the evidence demonstrates [s]he knew the 'essential objective' of the conspiracy, even if [s]he did not know all its details or played only a minor role in the overall scheme." *United States v. Guerra*, 293 F.3d 1279, 1285 (11th Cir. 2002). And here, the totality of the evidence directly implicated Ms. Badiki as an essential participant in the scheme. Accordingly, her conviction for WIC-fraud conspiracy must stand.

The evidence also directly implicated Ms. Badiki in the substantive fraud counts since it showed her involvement in a scheme to defraud, her intent to defraud, and her use of interstate wire transmissions for the purpose of executing the scheme. *See*

*Machado*, 886 F.3d at 1082-83.  Importantly, Ms. Badiki deposited the particular fraudulent WIC vouchers charged in the indictment. The fact that she, in some instances, crossed out redemption amounts and wrote in new amounts supports her knowledge of the fraudulent scheme.  And on at least one occasion, Ms. Badiki wrote in a cash ledger, "cash Fred for WIC, in the amount of $400."

Each of the substantive counts—the counts for wire fraud, theft of government funds, and WIC fraud—incorporated by reference the conspiracy allegations and included charges for aiding in abetting under 18 U.S.C. § 2.  Section 2 provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is *punishable as a principal*."  18 U.S.C. § 2(a) (emphasis added); *see also Rosemond v. United States*, 572 U.S. 65, 70 (2014).  This is because individuals who provide "knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime." *Id.* at 71 (citation and internal quotation marks omitted).  To establish a defendant's guilt under a theory of aiding and abetting, the government must prove the following: "(1) the substantive offense was committed by someone; (2) the defendant committed an act which contributed to and furthered the offense; and (3) the defendant intended to aid in its commission." *United States v. Camacho,* 233 F.3d 1308, 1317 (11th Cir. 2000).

Here, a reasonable jury could conclude that the government established each of these elements with respect to Ms. Badiki. The evidence showed that both Mr. and Mrs. Mediko engaged in wire fraud and theft of government funds when they purchased WIC vouchers for cash, and Ms. Badiki participated in the offenses when she deposited the WIC vouchers in the bank for payment by the federal government. The money obtained by the defendants was administered by the United States Department of Agriculture in the form of WIC voucher payments. And the other evidence we have already discussed also supports the jury's verdict that Ms. Badiki intended to aid in the substantive crimes. For these reasons, Ms. Badiki's convictions for wire fraud, theft of government funds, and WIC fraud must stand as well.

## B.    Sentencing

The district court sentenced Ms. Badiki to 54 months' imprisonment on each of the counts in the indictment, with the sentences to run concurrently. The sentence reflected a downward variance from the guidelines range, which the district court arrived at by applying, among other things, enhancements for role and obstruction of justice. Ms. Badiki challenges the application of these enhancements on appeal.

### 1.   Hearing Testimony

We begin by setting forth the evidence presented during the sentencing hearing as that evidence relates to the challenged enhancements. Aside from testifying about the loss calculations,

Agent McCree discussed two interviews of former Poly-Plex em-
ployee Tracie Robinson—one that occurred in 2016 and the other
in 2019.

Agent McCree explained that Poly-Plex had employed Ms.
Robinson as a driver between 2011 and 2012. He said that Ms. Rob-
inson had admitted to buying WIC vouchers for cash at Poly-Plex's
direction. During the 2016 interview, Ms. Robinson told Agent
McCree that Mrs. Mediko had instructed her (and other drivers) to
deliver envelopes of cash to various women and to return to Poly-
Plex with those women's WIC vouchers. According to Ms. Robin-
son, Agent McCree continued, Ms. Badiki and Mr. Mediko paid
drivers a commission of ten percent every time they exchanged a
WIC voucher for cash. Three years later, though, during her 2019
interview, Ms. Robinson testified that Ms. Badiki owned Poly-Plex
and was rarely physically present, though Ms. Badiki did pay cash
for commissions "as it pertains to milk, eggs, cheese, and infant for-
mula."[3]

In addressing the discrepancy between Ms. Robinson's 2016
and 2019 interviews, Agent McCree explained that, during the 2016
interview, Robinson was in "good shape" and "appeared to be
healthy" when he interviewed her. In contrast, he "didn't even rec-
ognize her when [he] saw her [again] in 2019." Agent McCree
thought that, at that time, Ms. Robinson "did not look healthy at

---

[3] Transcripts of Robinson's interviews are located at docket entries 135-5
and 137-3.

all" because she was suffering from medical conditions. He noted that Ms. Robinson had been in a coma for two to three months after the 2016 interview. As a result, Ms. Robinson told Agent McCree, her medical issues greatly affected her memory. While Ms. Robinson did not testify that anything she said during her 2016 interview was incorrect, Agent McCree explained that Robinson appeared to have trouble remembering things she had mentioned during the 2019 interview. Based on Ms. Robinson's testimony, the government sought a role enhancement against Ms. Badiki.

Agent McCree also addressed the box of fraudulent invoices during the sentencing hearing. He said that he received the box from Mr. Mediko's attorney, Mr. Morris, but that he did not know who prepared them, who directed the preparation of the invoices, or when they were created.

The government sought an enhancement for obstruction of justice based on the box of falsified invoices, noting that the defendants had stipulated that a representative of all of theirs had submitted the box. Although Ms. Badiki conceded that the invoices were false, she argued that the stipulation did not mean she knew false invoices were prepared or given to the government.

The district court applied both enhancements against Ms. Badiki. Concerning the obstruction enhancement, the court considered whether there was "proof of by whom or how the [box of fabricated] invoices were created" and whether all three of the defendants were involved in providing the invoices to the government. The court explained that it had "many issues" with Ms.

Okoli's testimony about the origin of the invoices. It also expressed its belief that "there's no way that the defendants would have allowed these documents to be submitted if they weren't thinking that they would help them in some way." Ultimately, the court concluded that the defendants initiated the submission of the box to try to help themselves. Given that the submission was made on behalf of Poly-Plex, and with respect to all three defendants joining in, the court applied the obstruction enhancement to Ms. Badiki.

As for Ms. Badiki's objection to the role enhancement, the district court overruled that, too, relying on our unpublished decision in *United States v. Stinson*, 659 F. App'x 534 (11th Cir. 2016). The court also denied Ms. Badiki's objections about the loss calculation and the two-level enhancement for abuse of a position of trust. We review the challenged enhancements below.

## 2.  Role Enhancement

Ms. Badiki argues that the district court erred in applying a role enhancement under U.S.S.G. § 3B1.1(c). In her view, although some evidence existed that she had control over the assets of Poly-Plex and some of its activities, the government failed to show that she controlled one or more other participants in the offense. We disagree.

When a defendant challenges the application of an enhancement under the Sentencing Guidelines, we normally review the district court's factual findings for clear error and its interpretation and application of the Sentencing Guidelines to the facts *de novo*.

*United States v. Gordillo,* 920 F.3d 1292, 1297 (11th Cir. 2019); *United States v. Alred,* 144 F.3d 1405, 1421 (11th Cir. 1998) (lower court's determination of a defendant's role in an offense is a factual finding subject to clearly erroneous review, but application of a guideline to the defendant's specific factual situation is a question of law reviewed *de novo*).

Clear-error review is deferential, so "we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been committed." *Gordillo*, 920 F.3d at 297 (quoting *United States v. Cruickshank*, 837 F.3d 1182, 1192 (11th Cir. 2016)). "The district court's choice between two permissible views of the evidence as to the defendant's role in the offense will rarely constitute clear error so long as the basis of the trial court's decision is supported by the record and does not involve a misapplication of a rule of law." *Cruickshank*, 837 F.3d at 1192 (cleaned up).

A district court applies a two-level enhancement when a defendant is an organizer, leader, manager, or supervisor in criminal activity that involved at least one other participant. *United States v. Phillips*, 287 F.3d 1053, 1058 (11th Cir. 2002). Thus, the two-level enhancement in Ms. Badiki's base offense level under U.S.S.G. § 3B1.1(c) is proper only if she was the organizer or leader of at least one other participant in the crime, meaning that she asserted control or influence over at least that one participant. *United States v. Glover*, 179 F.3d 1300, 1302-03 (11th Cir. 1999). Ms. Badiki need not be the sole leader of the conspiracy for the enhancement to

apply. *United States v. Barrington*, 648 F.3d 1178, 1200 (11th Cir. 2011).

Comment four of U.S.S.G. § 3B1.1, sets forth seven explanatory factors that illustrate whether a defendant is an "organizer" or a "leader," and we consider these factors in determining whether to apply the adjustment for aggravating role in the offense. *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009) (quoting *United States v. Gupta,* 463 F.3d 1182, 1198 (11th Cir. 2006) (*quoting* U.S.S.G. § 3B1.1 cmt. n.4). No requirement exists that "all of the considerations have to be present in any one case." *Martinez*, 584 F.3d at 1026 (citation and internal quotation marks omitted). Instead, the factors are "merely considerations for the sentencing judge." *Id.* (citation and internal quotation marks omitted).

In conducting this analysis, we start by agreeing with Ms. Badiki that her management of Poly-Plex's banking and business finances was not enough, by itself, to support a role enhancement. *See id.* (recognizing that "management of assets, standing alone, is insufficient to support an enhancement under Section 3B1.1.") Instead, "there must be evidence that the defendant exerted some control, influence or decision-making authority over another participant in the criminal activity." *Id.* This is so because the enhancement is meant to account for differences in co-conspirators' relative responsibility. *Id.*

The evidence presented during the sentencing hearing indicated that Ms. Badiki paid a 10% commission to drivers who exchanged the WIC vouchers for cash. That is sufficient for the

application of the enhancement. Incentivizing others to participate in a conspiracy by paying commissions implies the sort of hierarchical relationship necessary to uphold a role enhancement. *See id.*

We recognize that Ms. Robinson's 2016 interview—in which she revealed that Ms. Badiki paid employees a commission for trading cash for the WIC vouchers—represents the only piece of evidence supporting Ms. Badiki's exercise of control over Poly-Plex employees. But a sentencing court is generally free to consider whatever information it finds helpful in determining what sentence to impose, including hearsay. *United States v. Zlatogur*, 271 F.3d 1025, 1031 (11th Cir. 2001) (per curiam) (upholding enhancements based on hearsay). Indeed, a sentencing court "may consider any evidence, regardless of its admissibility at trial, in determining whether factors exist that would enhance a defendant's sentence, provided that (1) the evidence had sufficient indicia of reliability, (2) the court makes explicit findings of fact as to credibility, and (3) the defendant has an opportunity to rebut the evidence." *United States v. Hernandez*, 906 F.3d 1367, 1369 (11th Cir. 2018) (citing *United States v. Ghertler*, 605 F.3d 1256, 1269 (11th Cir. 2010)).

And a district court's failure to make explicit findings about the reliability of a witness's hearsay testimony "does not necessarily require reversal or remand where the reliability of the statements is apparent from the record." *United States v. Docampo*, 573 F.3d 1091, 1098 (11th Cir. 2009) (quoting *United States v.*

*Gordon*, 231 F.3d 750, 761 (11th Cir. 2000)).  We evaluate reliability of hearsay evidence on a case-by-case basis.  *United States v. Lee*, 68 F.3d 1267, 1275 (11th Cir. 1995).  To prevail on a sentencing challenge based on unreliable evidence, a defendant must show "(1) that the challenged evidence is materially false or unreliable and (2) that it actually served as the basis for the sentence." *Ghertler*, 605 F.3d at 1269.

Here, the district court did not clearly err when it credited Ms. Robinson's 2016 testimony that Ms. Badiki paid 10% commissions to drivers who purchased WIC vouchers for cash.  Ms. Badiki has not shown that the testimony was materially false or unreliable.  And though the court did not make explicit findings about Ms. Robinson's credibility during the sentencing hearing, the district court's conclusion that Ms. Robinson's testimony in this respect was reliable is apparent from the record.  True, Robinson's 2016 statement was more specific with respect to Ms. Badiki's role in paying commissions than her testimony during the 2019 interview. But there are no contradictions between the two interviews.

The primary difference between the two interviews is that, during the 2019 interview, Robinson did not affirmatively state that she received commissions from Ms. Badiki when she traded WIC vouchers for cash.  But she also did not affirmatively contradict her prior statement.  While an omission like this might cause pause under certain circumstances, here, the government offered a reasonable explanation:  Ms. Robinson had been in a coma for two to

three months and had memory problems as a result. Indeed, at the outset of her 2019 interview, Ms. Robinson told Agent McCree that she remembered little about working at Poly-Plex at all. Because the 2016 and 2019 statements don't directly contradict each other—one was just more detailed and complete than the other—and because Ms. Badiki does not refute the reasons for Ms. Robinson's lack of memory during the 2019 interview, Ms. Badiki failed to show that Ms. Robinson's statements were materially unreliable.

Ms. Robinson's 2016 interview supports the district court's conclusion that Ms. Badiki exercised control over other employees by paying commissions for WIC-vouchers that were exchanged for cash. We therefore conclude that the application of the role enhancement was not erroneous.

### 3. Obstruction-of-Justice Enhancement

The district court based its application of the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1 on the stipulation about the production of fraudulent invoices to the government. Ms. Badiki claims the stipulation established only that a "representative of the defendants" gave the invoices to the government and did not establish that she had any part in creating the invoices, that she knew they were false, or that she knew the box would be provided to the government. Without this type of knowledge, Ms. Badiki claims, she cannot be found to have acted willfully and with the purpose to obstruct justice, which § 3C1.1 requires. We find no error.

The guideline at issue here—U.S.S.G. § 3C1.1—provides that a criminal defendant's offense level shall be enhanced by two levels if "(1)the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." *United States v. Guevara*, 894 F.3d 1301, 1311 (11th Cir. 2018) (quoting U.S.S.G. § 3C1.1). To allow for meaningful appellate review, district courts typically must make specific findings of fact when they enhance sentences for obstruction of justice. *Id.* But if the record supports the enhancement by "clearly reflect[ing] the basis for [it,]" the district court need not make individualized findings regarding obstruction of justice. *Id.*

Application of the obstruction enhancement requires satisfaction of a clear *mens rea* requirement, meaning that a defendant must willfully obstruct or attempt to obstruct justice. *Id.* "'Willfully' means the defendant consciously acted with the purpose of obstructing justice." *United States v. Perkins*, 787 F.3d 1329, 1341 (11th Cir. 2015) (citing *United States v. Massey*, 443 F.3d 814, 819 (11th Cir. 2006)). The conduct supporting this enhancement, though, "can vary widely in nature, degree of planning, and seriousness." *United States v. Watts*, 896 F.3d 1245, 1254 (11th Cir. 2018) (citation and internal quotation marks omitted).

The Application Notes for § 3C1.1 list examples of covered conduct, including "producing or attempting to produce a false,

altered, or counterfeit document or record during an official investigation or judicial proceeding." U.S.S.G. § 3C1.1 cmt. n.4(C). And we have held that transmitting false documents to the government during an official investigation may constitute obstruction of justice. *See United States v. Callahan*, 981 F.2d 491, 496–97 (11th Cir. 1993).

Also noteworthy, Application Note 4(C), in contrast with other types of obstructive conduct listed in the Guidelines, does not contain any qualifier requiring the production of a fraudulent document to materially mislead authorities. And the plain text of that application note shows that the enhancement is appropriate upon the *production* of the false document to the government.

Here, the district court did not clearly err when it determined that Ms. Badiki obstructed justice based on the tendering of the fraudulent invoices to the government. Ms. Badiki conceded the falsity of the documents during the sentencing hearing, and vendors' representatives testified at trial that the invoices were in fact fraudulent. Ms. Badiki did not need to create the documents for them to be used against her for the obstruction enhancement. Rather, the mere *production* of the fraudulent documents was enough, as long as Ms. Badiki was aware that the documents were fraudulent. *See Callahan*, 981 F.2d at 496-97 and *Cordero-Castro*, 688 F. App'x at 636.

Before announcing its ruling, the district court expressed its belief that, based on the evidentiary record, "there's no way that the defendants didn't know what was in there." The court also

concluded that "there's no way that the defendants would have allowed these documents to be submitted if they weren't thinking that they would help them in some way." Indeed, the court found that the defendants initiated the submission of the box to try to help themselves and likely did not consider that someone would look at the invoices closely to determine that they were fraudulent. Given that the submission was made on behalf of Poly-Plex, and all three defendants joined it, the court determined the enhancement was applicable.

Although no direct evidence showed that Ms. Badiki knew that the invoices were fraudulent, based on the evidence of record, the court could reasonably infer that she knew about the falsity of the invoices. Ample evidence showed that Ms. Badiki was involved in the management of Poly-Plex and was responsible for depositing WIC vouchers at the bank. And other evidence we have already discussed supports a finding that she was engaged in a conspiracy to defraud the government of money by falsely claiming to have redeemed WIC vouchers for eligible goods. So we cannot conclude that the district court clearly erred in concluding that the defendants (including Ms. Badiki)—who knew they were in trouble and who were the only ones in a position to benefit from the fraudulent production—caused the presentation of fraudulent invoices to the government.

To be sure, the district court could have chosen to believe Ms. Okoli's testimony that none of the defendants had anything to do with the creation or production of the invoices. But the district

court was not required to accept Ms. Okoli's testimony. And here, the district court explained that it had "many issues" with Ms. Okoli's testimony as to the origin of the invoices. Given the nature of that testimony and the fact that the invoices mysteriously covered only the years under investigation, we cannot say that the district court clearly erred in rejecting Ms. Okoli's testimony. On the contrary, the district court's finding that Okoli was not credible was reasonable under the circumstances. *See, e.g., United States v. Rodriguez*, 398 F.3d 1291, 1296–97 (11th Cir. 2005) (finding no clear error when the district court exercised its discretion when deciding whose testimony it believed); *Castaneda-Pozo*, 877 F.3d 1249, 1251 (11th Cir. 2017) (per curiam) (same).

## V.    Mr. Mediko's Claims

Mr. Mediko raises three issues on appeal. First, he claims his Sixth Amendment right to counsel was violated because his attorney, Mr. Morris, had a conflict of interest that adversely affected his performance at trial. Second, Mr. Mediko claims that, because of this alleged conflict, the district court was required to conduct a *Garcia*[4] hearing but failed to do so. Third, Mr. Mediko contends the district court abused its discretion when it denied his motion for mistrial based on the government's allegedly improper

---

[4] The holding in *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975), requires a district court to conduct an inquiry when a potential conflict of interest exists between an attorney and her client. If a conflict exists, a "*Garcia* hearing" ensures that the defendant "knowingly, intelligently, and voluntarily" waives his right to conflict-free counsel. *Id.*at 278.

statements about the fabricated invoices during closing arguments. We address each argument in turn.

## A.    Sixth Amendment Claim

First, Mr. Mediko claims that Mr. Morris had a conflict of interest and that the conflict adversely affected his performance at trial. In Mr. Mediko's view, Mr. Morris could have provided exculpatory evidence that Mr. Mediko did not give the box of fabricated invoices to Mr. Morris. But because Mr. Morris represented Mr. Mediko at trial, Mr. Mediko complains, the district court ruled that Mr. Morris could not testify on Mr. Mediko's behalf. Mr. Mediko further contends that Mr. Morris's conflict impaired his ability to represent Mr. Mediko and caused Mr. Morris to agree to stipulate to the introduction of the box of invoices. According to Mr. Mediko, that violated his Sixth Amendment right to counsel. We are not persuaded.

The Sixth Amendment of the Constitution guarantees criminal defendants the right to effective assistance of counsel for their defense. U.S. Const. amend. VI; *McCann v. Richardson*, 397 U.S. 759, 771 (1970). Effective assistance of counsel includes counsel who is "unimpaired by conflicting loyalties." *Duncan v. Alabama*, 881 F.2d 1013, 1016 (11th Cir. 1989). The right to effective assistance of counsel "encompasses the right to representation free from actual conflict with defense counsel." *Buenoano v. Singletary*, 74 F.3d 1078, 1086 (11th Cir. 1996) (per curiam). Questions about conflicts of interest are mixed questions of law and fact that

we review *de novo*. *Porter v. Singletary*, 14 F.3d 554, 561 (11th Cir. 1994).

To establish a Sixth Amendment claim arising from an alleged conflict of interest when the defendant did not object at trial—as is the case here—a defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348 (1980). That means that to rule for Mr. Mediko, we must be convinced that the conflict is real, not merely hypothetical or speculative. *Buenoano*, 74 F.3d at 1086. The mere possibility of a conflict of interest does not rise to the level of a Sixth Amendment violation. *Id.* (citing *Smith v. White,* 815 F.2d 1401, 1404 (11th Cir.), *cert. denied,* 484 U.S. 863 (1987)); *see also Burden v. Zant*, 24 F.3d 1298, 1305 (11th Cir. 1994) (a defendant must prove that trial counsel had an actual conflict of interest in which he "actively represented conflicting interests;" "the mere possibility of a conflict 'is insufficient to impugn a criminal conviction'") (quoting *Cuyler*, 446 U.S. at 350).

A defendant establishes an actual conflict when he shows that counsel had conflicting interests and that he, in fact, made a choice between two or more courses of action, "such as eliciting (or failing to elicit) evidence that favors an interest in competition with that of the defendant." *Ferrell v. Hall*, 640 F.3d 1199, 1244 (11th Cir. 2011) (citations and internal quotation marks omitted). If the attorney did not make this type of choice, the conflict is merely hypothetical. *Id.*

Mr. Mediko argues that an actual conflict of interest existed between him and Mr. Morris for two reasons:  in Mr. Mediko's view, (1) Mr. Morris was a necessary witness; and (2) Mr. Morris's interests were inconsistent with Mr. Mediko's.  In support of these arguments, Mr. Mediko relies on various rules of professional conduct governing lawyers in Georgia, including one such rule that precludes a lawyer from acting as an advocate at a trial in which he is likely to be a necessary witness (unless certain conditions not applicable here are met).  *See* Ga. Rules of Prof'l Conduct R. 3.7(a) and *Delevan v. State*, 811 S.E.2d 71, 74 (Ga. Ct. App. 2018).  A lawyer is a necessary witness when no other evidence is available to prove those facts.  *Id.* at 75 n.13.

Mr. Mediko also points to Rule 1.7(a) of Georgia's Rules of Professional Conduct, which provides that a lawyer "shall not represent or continue to represent a client if there is a significant risk that the lawyer's own interests . . . will materially and adversely affect the representation of the client." Ga. Rules of Prof'l Conduct R. 1.7(a).  The only exception to this rule is if the client provides written consent.  *See* Ga. Rules of Prof'l Conduct R. 1.7(b).  The commentary to the rule explains that "[l]oyalty to a client is impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other competing responsibilities or interests." Ga. Rules of Prof'l Conduct R. 1.7 cmt. 2.

We consider Mr. Mediko's argument that Mr. Morris was a necessary witness and that his interests were inconsistent with

those of Mr. Mediko under a Sixth Amendment conflict-of-interest analysis. As to Mr. Mediko's contention that Mr. Morris improperly agreed to enter into the stipulation, we conclude that that issue is more properly framed as an ineffective-assistance-of-counsel claim. We explain below why, on direct appeal, neither warrants reversal of the district court's order denying mistrial.

### 1. Did an actual conflict of interest exist?

According to Mr. Mediko, Mr. Morris was a necessary witness because his testimony was relevant to disputed, material questions of fact, including "who provided the box of false documents and whether Mr. Mediko was involved in that process." Because the lower court prevented Mr. Morris from testifying, Mr. Mediko says he was deprived of his right to question a witness about the custody of the box or its source. He also asserts that no other evidence was available to prove those facts, resulting in an actual conflict of interest between himself and his counsel.

We disagree. Mr. Morris was not a necessary witness at trial. Contrary to Mr. Mediko's argument, the relevant question was not *who* provided the box of fraudulent invoices to Morris, but rather, whether Mr. Mediko orchestrated the falsification of the invoices, knew about their existence, or knew that they would be provided to the government. Even if Mr. Mediko did not physically hand the invoices to his attorney, that fact alone would not absolve him of the taint associated with the falsified invoices.

And on that critical question of whether Mr. Mediko knew the invoices were false before Mr. Morris turned them over to the government, Mr. Morris could provide no evidence. Rather, Mr. Morris could deny only "any suggestion that [the box of invoices] *came* from [Mr. Mediko], because that [was] not factually correct." But *who* provided the documents to Mr. Morris was not the issue at trial.

Not only that, but even if Mr. Mediko could show that Mr. Morris's testimony was material to his defense, he failed to show that he could not obtain this evidence through another source. In fact and to the contrary, when Ms. Okoli testified, Mr. Mediko and the other defendants presented evidence that Mr. Morris could not even have provided—that is, that none of the defendants knew the invoices were fabricated. Ms. Okoli testified in depth that *she* fabricated the invoices with a co-worker and never told anyone about the falsified documents until she spoke with Mr. Mediko on a weekend during trial. And under Ms. Okoli's version of the facts, because Mr. Morris had produced the box of documents to the government years earlier, regardless of who gave Mr. Morris the invoices, Mr. Mediko could not have known about them. On cross-examination, Mr. Morris could have asked Ms. Okoli any number of things, including (1) to whom she gave the box of documents and (2) whether Mr. Mediko was aware that the fraudulent invoices had been made. He did not. Regardless, Mr. Okoli testified that neither Ms. Badiki nor *anyone* at Poly-Plex asked her to create the invoices.

To be sure, the jury apparently did not believe Ms. Okoli's testimony. But that does not bear on whether it was available to Mr. Mediko. It clearly was.

Under these circumstances, Mr. Morris was not a necessary witness, so no actual conflict of interest could have existed. *See United States v. Roberson*, 897 F.2d 1092, 1098 (11th Cir. 1990 (no error in excluding testimony by attorney where other witnesses were available).

As for Mr. Mediko's second argument—that Morris's interests impaired his ability to effectively represent his client—Mr. Mediko alleges Mr. Morris was concerned with minimizing his role in providing the box of fraudulent invoices to the government. As Mr. Mediko tells it, aside from attempting to avoid the appearance of impropriety, Mr. Morris allegedly stipulated to the use of the invoices at trial to prevent a circumstance where he would be required to testify.

We easily reject this argument. No evidence exists that Mr. Morris harbored conflicting interests based on a desire to minimize his role with respect to the invoices. Nobody suggested that he was involved in the fabrication of the invoices or that he knew the documents were fraudulent when he transmitted them to the government. This case differs greatly from those Mr. Mediko relies on in support of his position. *See e.g., United States v. Greig*, 967 F.2d 1018, 1022-24 (5th Cir. 1992) (actual conflict found where attorney was accused of obstructing justice by pressuring a government witness not to testify against the defendant); *United States v. McLain*,

823 F.2d 1457, 1463-64 (11th Cir. 1987) (finding actual conflict of interest where defense counsel was under investigation by same office that was prosecuting the defendant)).  Instead, this case is more like *United States v. Montana*, 199 F.3d 947 (7th Cir. 1999), where no conflict existed when defense counsel merely acted as a courier of a note containing a bribe and had not read the note. Here, too, nothing suggests that Mr. Morris was involved in the preparation of the falsified invoices or knew they were fraudulent when he produced them to the government.

Because no actual conflict of interest arose between Mr. Mediko and his attorney, we need not consider whether Mr. Mediko was adversely affected by an actual conflict.

2. Ineffective Assistance of Counsel

Mr. Mediko contends Mr. Morris had no good reason to enter into the stipulation after the district court announced that it would exclude evidence of the fraudulent invoices under Rule 403. And he says that Mr. Morris's actions adversely affected him.  We conclude this argument is more properly addressed as an ineffective-assistance-of-counsel claim.  While we can address such claims on direct appeal when they are based on a conflict of interest, *United States v. Rodriguez*, 982 F.2d 474 (11th Cir. 1993) (per curiam), we will do so only if the record is sufficiently developed. *United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002).  Here, it is not.

20-14461                Opinion of the Court                43

This claim is better resolved on a 28 U.S.C. § 2255 claim. On this record, we cannot ascertain why Mr. Morris stipulated to the entry of the invoices into evidence after the district court indicated its inclination to keep the documents out. We do not express any opinion as to the viability (or lack thereof) of such a claim. We simply do not have sufficient record evidence to decide the issue.

## B.    *Garcia* Hearing

Related to his first conflict-of-interest argument, Mr. Mediko contends the district court erred by failing to conduct a hearing, as required by *Garcia*, 517 F.2d at 277-78,[5] to determine whether a conflict of interest existed between himself and Mr. Morris. We review for abuse of discretion the district court's failure to hold a *Garcia* hearing on whether to disqualify Mr. Morris. *United States v. Garcia*, 447 F.3d 1327, 1337 (11th Cir. 2006). Under the circumstances, we find no abuse of discretion.

As we have mentioned, when it is apparent that a potential conflict of interest exists, the district court must conduct an inquiry to ensure the defendant is "knowingly, intelligently, and voluntarily" waiving his constitutional right to conflict-free counsel. *Garcia*, 517 F.2d at 278; *United States v. Valois*, 915 F.3d 717, 727 (11th Cir. 2019). But the district court has no "duty to inquire into the possibility of a conflict" when neither defense counsel nor the record

---

[5] This Court adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981 (en banc).

alerts the court to that possibility. *United States v. Medel*, 592 F.2d 1305, 1312-13 (5th Cir. 1979); *Valois*, 915 F.3d at 727-28. In other words, the district court need not initiate an inquiry unless it knows or reasonably should know that a particular conflict might exist. *Cuyler*, 446 U.S. at 347. And a district court's failure to conduct a *Garcia* hearing will result in reversal only if an actual conflict of interest exists. *United States v. Mers*, 701 F.2d 1321, 1326 (11th Cir. 1983) (holding a failure to hold a *Garcia* holding is harmless error if no actual conflict exists).

The record reflects, and both parties acknowledge, that the district court did not conduct a hearing regarding the conflict-of-interest issue. Although a *Garcia* hearing may have been the safe route, for two reasons the district court's failure to conduct a *Garcia* hearing does not warrant reversal.

First, Mr. Morris represented Mr. Mediko for at least four years before trial and never alerted the district court as to any potential conflict of interest in his representation of Mr. Mediko. While Mr. Mediko suggested that the district court's awareness of Mr. Morris's role in transmitting the box of documents should have triggered the court's duty to inquire into the potential conflict, attorneys routinely transmit documents to the government at the pretrial stage. Nothing in the record alerted the district court to any potential conflict in Mr. Morris's representation such that it was required to inquire into whether a conflict existed and whether Mr. Mediko waived his right to conflict-free counsel.

Indeed, the district court did not even become directly involved in the issue over the fraudulent invoices until the morning of trial,[6] when the defendants filed their motion to exclude the evidence. By that point, the parties had been attempting to work out a stipulation, and no one suggested that a possible conflict of interest existed between Mr. Mediko and his attorney. Although the record reflects that the district court was concerned that Mr. Morris might have to take the stand about the transmittal of the box of documents, the parties ultimately expressed that they had entered into a stipulation over the documents. Under these facts, the district court did not abuse its discretion when it failed to hold a *Garcia* hearing.

Second, even if the court's failure to conduct a *Garcia* hearing constituted an abuse of discretion, reversal is not warranted unless an actual conflict of interest existed. *See Mers*, 701 F.2d at 1326

---

[6] Although the government informed the court about the box of invoices during a pretrial conference held on November 13, 2019, at that point, the parties conveyed that they were attempting to agree on a stipulation regarding the box. This discussion prompted the court to issue an order the following day, in part, setting forth that the parties had stipulated that the box contained fabricated invoices and that a representative of defendants provided it to the government. The district court did not become directly involved in the issue until the morning of trial on December 2, 2019, when the defendants filed their motion to exclude the documents.

(the absence of a *Garcia* hearing "will not mandate reversal absent an actual conflict of interest"). But as we have already discussed, Mr. Mediko failed to show that an actual conflict of interest existed between himself and his attorney. Consequently, reversal is not warranted in any event.

## C.    Remarks Made During Closing Arguments

For his final argument, Mr. Mediko asserts the district court abused its discretion when it denied his motion for a mistrial based on comments the government made during closing arguments. Mr. Mediko takes issue with the government's implication of him in the production of fraudulent invoices. He also says the statements the government made during closing impugned his credibility.

We review the denial of a motion for mistrial for an abuse of discretion. *Valois*, 915 F.3d at 723 n.2; *United States v. Wright*, 392 F.3d 1269, 1274 (11th Cir. 2004). To establish prosecutorial misconduct in the context of closing arguments, a defendant must show two things: "(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Reeves,* 742 F.3d 487, 505 (11th Cir. 2014) (citations and internal quotation marks omitted). Substantial rights are prejudicially affected if a reasonable probability exists that, but for the remarks, the outcome of the trial would have been different. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006); *see also United States v. Mathurin*, 868 F.3d 921, 930 (11th

Cir. 2017). When the record contains sufficient independent evidence of guilt, any error is harmless. *Eckhart,* 466 F.3d at 947.

We generally consider four factors in deciding whether prosecutorial misconduct has occurred: "(1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused." *United States v. Feliciano*, 761 F.3d 1202, 1211 (11th Cir. 2014) (citation and internal quotation marks omitted); *See also Reeves*, 742 F.3d at 505. We have explained that a prosecutor's comments during closing arguments must be "viewed in the context of the trial as a whole." *Id.*

Here, the challenged comments were neither false nor misleading, especially when considering the context of the trial and closing arguments as a whole. Mr. Mediko contends that the government singled him out for blame when it argued that "his representative provide[d] this box of fraudulent and forged vouchers." While the government used the phrase "*his* representative" in one instance, elsewhere, it said that a "representative of the *defendants*" provided the documents to the government. The government also made the same arguments with respect to *each* of the defendants; it did not single out Mr. Mediko.

At the outset of the closing arguments, the government argued that after the search warrant was conducted, "the *defendants* provided a box filled with fabricated invoices in a desperate effort"

to conceal their fraud.  Similarly, it noted, "when the *defendants* knew they were caught, they provided invoices that were completely fabricated."  Later, when discussing evidence supporting Ms. Badiki's guilt, the government pointed to, among other thigs, the box of fabricated invoices.  It noted the lack of dispute that "a representative of the *defendants* provided that box."  And when summing up the evidence of Mr. Mediko's guilt, the government stated that "[t]he defendants *each* attempted to hide the truth, both in terms of lying to investigators and then you heard the acts of delivering the fabricated invoices to the government."  Taking all the statements together, the district court correctly concluded that the government's closing argument did not "single out" a particular defendant with respect to the falsified invoices.

And even assuming that the remark that "[Mr. Mediko's] representative provide[d] th[e] box of fraudulent and forged vouchers" was improper, the statement was isolated. *See Feliciano*, 761 F.3d at 1211.  The trial was not replete with improper comments that would warrant reversal. *See Eckhardt*, 466 F.3d at 947 ("Even if these comments were inappropriate, reversal is only warranted if the entire trial is so replete with errors that [the defendant] was denied a fair trial").

Plus, Mr. Mediko's counsel vigorously refuted any inference that Mr. Mediko had produced the fraudulent invoices.  During Mr. Mediko's closing, Mr. Morris suggested that "[t]here is no evidence at all that [Mr. Mediko] had anything to do with fabricating documents."  Instead, he pointed to the testimony of Ms. Okoli, who

said she had not initially told Mr. Mediko about the documents. He also argued that "there is no evidence whatsoever that when that box was turned over, that any of these defendants, or especially [Mr.] Mediko, knew that what was in that box was false." And Mr. Morris further reiterated that Mr. Mediko "didn't have anything to do with it, and there's no evidence that he did."

Finally, the strength of the evidence was great, and it was sufficient to establish Mr. Mediko's guilt notwithstanding the remark about the invoices. *See Eckhardt*, 466 F.3d at 947 (noting that the particular evidence would have led to a conviction regardless of the prosecutor's statements). First, individuals testified that they sold their WIC vouchers to Mr. Mediko in exchange for cash numerous times. Second, Ms. Brent testified to undercover sales of WIC vouchers at Poly-Plex involving Mr. Mediko. According to Ms. Brent, Mrs. Mediko would go to the back office to collect cash from Mr. Mediko in exchange for the WIC vouchers. These undercover purchases were caught on video surveillance.

Third, Investigator Jewell testified about two on-site inspections she conducted at Poly-Plex in October and December of 2011, during which she discussed Poly-Plex's deficient WIC inventory with Mr. Mediko. During the second inspection, Mr. Mediko claimed that Poly-Plex had not accepted any WIC vouchers "in a while" due to problems with its EBT point-of-sale terminal. But this explanation made no sense because WIC vouchers are not processed with EBT terminals, and the lack of an EBT machine would not have any effect on a vendor's ability to accept WIC vouchers.

Mr. Mediko also said that no WIC vouchers were on site, but redemption data showed that Poly-Plex redeemed more than 3,000 WIC vouchers that same month.

For all these reasons, the district court did not abuse its discretion when it denied Mr. Mediko's motion for mistrial based on the government's comments during closing arguments.

## VI.    Mrs. Mediko's Claim

Finally, Mrs. Mediko raises a single claim.  She asserts that the district court violated her constitutional right to present a defense when it prevented her from calling Mr. Morris as a witness. Mrs. Mediko claims if she had been permitted to call him, Mr. Morris would have corrected the misleading impression that she was involved in the presentation of the false invoices to the government.  Because of the district court's ruling, Mrs. Mediko contends, she was wrongly prevented from presenting "critical and exculpatory evidence at trial."  Mrs. Mediko asserts her sole defense at trial was that she did not know that she could not purchase WIC vouchers for money, so Mr. Morris's testimony was critical to support her contention that she lacked a criminal plan to conspire with her co-defendants.

We review a district court's evidentiary rulings for abuse of discretion.  *United States v. Knowles*, 889 F.3d 1251 (11th Cir. 2018); *United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir. 1992).  A trial court has "broad discretion under Federal Rule of Evidence 611(b) to determine the permissible scope of cross-

examination." *Id*. This discretion, however, is subject to the requirements of the Sixth Amendment, which guarantees every accused the right to confront witnesses against her. *Id*.; U.S. Const. amend. VI. The Sixth Amendment also guarantees a criminal defendant the right to have "compulsory process for obtaining witnesses in [her] favor." U.S. Const. amend. VI ; *United States v. Hurn*, 368 F.3d 1359, 1362 (11th Cir. 2004). This right is not absolute, as the accused does not have an "unfettered right" to offer testimony that is "incompetent, privileged, or otherwise inadmissible under the standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

To determine whether a criminal defendant's claim under the Sixth Amendment right to call witnesses in her defense was violated, we conduct a two-step analysis. First, we assess whether the defendant's constitutional right was actually violated. If it was, then we evaluate whether the error was harmless beyond a reasonable doubt. *Hurn*, 368 F.3d at 1362-63. Typically, four circumstances exist under which a criminal defendant must be allowed to introduce evidence: (1) "a defendant must generally be permitted to introduce evidence directly pertaining to any of the actual elements of the charged offense or an affirmative defense"; (2) "a defendant must generally be permitted to introduce evidence pertaining to collateral matters that, through a reasonable chain of inferences, could make the existence of one or more of the elements of the charged offense or an affirmative defense more or less certain"; (3) "a defendant generally has the right to introduce evidence that

is not itself tied to any of the elements of a crime or affirmative defense, but that could have a substantial impact on the credibility of an important government witness"; and (4) "a defendant must generally be permitted to introduce evidence that, while not directly or indirectly relevant to any of the elements of the charged events, nevertheless tends to place the story presented by the prosecution in a significantly different light, such that a reasonable jury might receive it differently." *Id.* at 1363.

Mrs. Mediko contends that the second and fourth circumstances apply here because the government either cast her in an "inaccurate, unfavorable light" or "ma[de] entirely legitimate, normal, or accepted acts appear unusual or suspicious." She says she had the right to introduce evidence to dispel this "unjustified taint" even if the evidence did not directly or indirectly bear on any element of an offense. *Id.* at 1366–1367. We are not persuaded.

We first note that it was incumbent upon Mrs. Mediko's counsel to make an adequate proffer of the substance of the supposed excluded evidence to show that it was wrongly excluded. *See United States v. Sheffield*, 992 F.2d 1164, 1169 (11th Cir. 1993). We have explained that we require this step "to alert the [trial] court and opposing counsel to the thrust of the excluded evidence, enabling them to take appropriate action, and to construct a record appropriate for appellate review." *Id.* (citation and internal quotation marks omitted). Here, Mrs. Mediko's counsel proffered the following:

> I would ask [Mr. Morris] how he got in possession of the [box of falsified] documents. And I will ask him: do you have any information at all that [Mrs. Mediko] had any knowledge, involvement, consent in, any party to a crime, any conspiracy, anything to know what's in those [fraudulent] documents? And I believe the answer would be: no, I do not.

Docket Entry 188 at 728.

The problem for Mrs. Mediko is that Mr. Morris's proffered testimony would not have elucidated much regarding her intent. Based on the proffer, Mr. Morris's expected testimony was that he *did not have any information about* Mrs. Mediko's involvement in the falsified invoices. This differs substantially from Mrs. Mediko's argument on appeal—that Mr. Morris would have provided testimony that Mrs. Mediko did not participate in the production of the invoices nor was she aware that they had been produced. Exclusion of testimony that Mr. Morris did not know whether Mrs. Mediko was involved would not satisfy either of the two circumstances in *Hurn* on which Mrs. Mediko relies.

Mrs. Mediko's reliance on our decisions in *United States v. Sheffield*, 992 F.2d 1164 (11th Cir. 1993), and *United States v. Todd*, 108 F.3d 1329 (11th Cir. 1997), is also misplaced. The facts of this case are distinguishable from *Sheffield* since there, the excluded evidence would have supported the defendant's good-faith state of

mind. Here, Mr. Morris's testimony does not tell us anything about Mrs. Mediko's state of mind. This fact also distinguishes our case from *Todd*, where the excluded evidence was relevant to the defendant's state of mind.

We further reject Mrs. Mediko's contention that Mr. Morris was the only witness who could have presented testimony with respect to her knowledge and intent about the falsified invoices. As we have explained, Ms. Okoli took the stand and testified that *she* fabricated the invoices. Mrs. Mediko's attorney could have, but did not, question Ms. Okoli about the origin of the documents. If he had, and if such evidence existed, he could have elicited the facts that (1) Mrs. Mediko did not direct Ms. Okoli to create the false invoices, (2) Mrs. Mediko was not aware that the fraudulent invoices had been made, (3) Mrs. Mediko did not take the fraudulent invoices from Ms. Okoli, (4) Mrs. Mediko did not produce the documents to the government, and (5) Mrs. Mediko was not aware that the box of documents had been produced.

In short, Mrs. Mediko's constitutional rights were not actually violated when the district court precluded her from questioning Mr. Morris.

But even assuming the exclusion of Mr. Morris's testimony violated Mrs. Mediko's constitutional rights, we would not reverse her conviction because any such error by the trial court was harmless.

The Sixth Amendment guarantees criminal defendants the right to confront witnesses, but the harmless-error doctrine applies to violations of the Confrontation Clause. *United States v. Edwards*, 211 F.3d 1355, 1359 (11th Cir. 2000). The relevant inquiry is "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). In assessing the impact of the exclusion of testimony here, we must decide "whether we have a reasonable doubt that the result in [Mrs. Mediko's] case would have been the same had [s]he been able to call [Mr. Morris] to the stand as a witness on [her] behalf." *United States v. Hernandez*, 141 F.3d 1042, 1050 (11th Cir. 1998).

Any constitutional error may be considered harmless if "there was ample evidence to convict absent the error." *United States v. Nunez*, 1 F.4th 976, 992 (11th Cir. 2021). Because the evidence of Mrs. Mediko's guilt was overwhelming—even without reference to the box of fraudulent documents (or even if Mr. Morris had been allowed to testify)—any error by the district court was harmless.

First, the jury saw Mrs. Mediko on video purchasing WIC vouchers from undercover informant Amanda Brent. Ms. Brent conducted four sales at Poly-Plex. During all but one of the transactions, Ms. Brent gave her WIC vouchers to Mrs. Mediko inside Poly-Plex. Mrs. Mediko then collected cash from Mr. Mediko in exchange for the WIC vouchers. The fourth time, Mrs. Mediko

told Ms. Brent she would let her know when Mr. Mediko returned and would provide the money at that time. The videos also showed Mrs. Mediko taking precautions when she exchanged cash for the vouchers, including walking outside the store to pay Ms. Brent on multiple occasions. Ms. Brent said that "[s]ometimes [Mrs. Mediko] would put [cash] inside the actual WIC folder. Sometimes she would discreetly pass it over to me inside the store." Mrs. Mediko's apparent efforts to secrete the cash exchanges for the vouchers supported the notion that she knew that the transactions were illegal.

Yvette Jackson similarly testified that she sold WIC vouchers to Mrs. Mediko at Poly-Plex. And both Ms. Jackson and Ms. Brent stated that before making their first sale, Mrs. Mediko vetted them to make sure that it was "safe" to go forward with the transaction. The video played for the jury showed how Mrs. Mediko asked Ms. Brent repeatedly who told her to come to Poly-Plex to exchange WIC vouchers for cash. Again, Mrs. Mediko's vetting of the customers supported the conclusion that she knew that purchasing WIC vouchers for cash was illegal.

Plus, the jury heard a recorded telephone call between Mrs. Mediko and Ms. Brent during which Mrs. Mediko asked her to "lie to [her] doctor" that her baby was throwing up so that the doctor would prescribe Peptamen, which had a "higher dollar amount on that voucher." The call supports an inference that Mrs. Mediko knew that false redemptions for certain items would gain Poly-Plex

more money than would false redemptions for other items. It also shows Mrs. Mediko's fraudulent intent.

Finally, Agent McCree's testimony also supports an inference that Mrs. Mediko knew the transactions were illegal. He testified that while the team conducted the search warrant, Mrs. Mediko agreed to an interview. And during that interview, Mrs. Mediko denied "at least three times" that she bought WIC vouchers. Even after being shown one of the undercover videos, she still denied buying the WIC vouchers. That Mrs. Mediko lied about the WIC-voucher purchases provides yet more support that she knew the conduct was illegal.

In sum, even without any reference to the box of false invoices, the other evidence strongly points to Mrs. Mediko's guilt and her fraudulent intent to buy the WIC vouchers. While Mrs. Mediko claims that Mr. Morris's testimony was essential, she does not adequately articulate how it could negate all the evidence set forth above. Any testimony by Mr. Morris that Mrs. Mediko did not provide the box to him would not have altered the outcome here since that evidence would not have gone to Mrs. Mediko's intent. And more than enough evidence supported the jury's conclusion that she knew about the illegality of her conduct. We therefore conclude that any constitutional error in refusing to allow Mrs. Mediko to cross-examine Mr. Morris was harmless since "there was ample evidence to convict absent the error." *Nunez*, 1 F.4th at 992.

## VII.    Conclusion

For the foregoing reasons, we affirm the convictions and sentences of Ms. Badiki, Mr. Mediko, and Mrs. Mediko.

**AFFIRMED.**